John J. Hebert (#010633)
Philip R. Rudd (#014026)
Wesley D. Ray (#026351)
**POLSINELLI SHUGHART PC**
CityScape Plaza
One E. Washington, Suite 1200
Phoenix, AZ 85004
Telephone: (602) 650-2000
Facsimile: (602) 264-7033
E-mail: PhoenixBankruptcyECF@polsinelli.com
E-Mail: jhebert@polsinelli.com
E-Mail: prudd@polsinelli.com
E-Mail: wray@polsinelli.com

*Attorneys for Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT

## THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>RCC SOUTH, LLC,<br><br>               Debtor. | Chapter 11 Proceedings<br><br>Case No. 2:10-bk-23475-SSC<br><br>**THIRD AMENDED DISCLOSURE STATEMENT RELATING TO PLAN OF REORGANIZATION** |

### I.     INTRODUCTION

Debtor RCC South, L.L.C., debtor and debtor-in-possession in the above captioned bankruptcy case ("RCC South" or "Debtor"), hereby submits to the Court and creditors of the Debtor's estate the following "Third Amended Disclosure Statement Relating to Plan of Reorganization" (the "Disclosure Statement"). This Disclosure Statement is submitted pursuant to 11 U.S.C. § 1125.

11 U.S.C. § 1125(b) prohibits the solicitation of acceptances or rejections of a Plan of Reorganization unless such Plan is accompanied by a copy of the Disclosure Statement which has been approved by the Bankruptcy Court.

The purpose of this Disclosure Statement is to provide creditors and interested parties in this bankruptcy proceeding with such information as may reasonably be deemed sufficient to allow

2784057.1
2790035.1

creditors and interested parties to make an informed decision regarding the Debtor's "Third Amended Plan of Reorganization Dated" (the "Plan").

Unless otherwise noted, those portions of the Plan and this Disclosure Statement providing factual information concerning the Debtor, its assets and liabilities, have been prepared from information submitted by the Debtor and its retained professionals.

This Disclosure Statement contains information that may influence your decision to accept or reject the Debtor's proposed Plan. Please read this document with care.

The financial information contained in this Disclosure Statement has not been subjected to an audit by an independent certified public accountant. For that reason, the Debtor is not able to warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy. To the extent practicable, the information has been prepared from the Debtor's financial books and records and great effort has been made to ensure that all such information is fairly represented.

This Disclosure Statement and the Plan will classify all creditors into Classes. The treatment of each Class of creditors will be set forth in this Disclosure Statement and in the Plan. You should carefully examine the treatment of the Class to which your Claim will be assigned.

This Disclosure Statement requires approval by the Bankruptcy Court after notice and a hearing pursuant to 11 U.S.C. §1125(b). Once approved, the Disclosure Statement will be distributed with the Debtor's proposed Plan for voting. Approval of the Disclosure Statement by the Bankruptcy Court does not constitute either certification or approval of the Debtor's Plan by the Bankruptcy Court or that the Disclosure Statement is without any inaccuracy.

The Bankruptcy Court will confirm the Plan if the requirements of §1129 of the Bankruptcy Code are satisfied. The Bankruptcy Court must determine whether the Plan has been accepted by each impaired Class entitled to vote on the Plan. Impaired Classes entitled to vote on the Plan are those Classes of claims whose legal, equitable, or contractual rights are altered, as defined under §1124 of the Bankruptcy Code. An impaired Class of claims is deemed to have accepted the Plan if at least two-thirds (2/3) in amount of those claims who vote and more than one-half (1/2) in

2784057.1
2790035.1

number of those claims who vote have accepted the Plan. An impaired Class of interests is deemed to have accepted the Plan if the Plan has been accepted by at least two-thirds (2/3) in amount of the allowed interests who vote on the Plan.

Even if each Class of creditors does not accept the Plan, the Plan can be confirmed under §1129(b) of the Bankruptcy Code, so long as one impaired Class of creditors accepts the Plan. This is referred to as the "cram down" provision of the Bankruptcy Code. The failure of each Class to accept the Plan could very well result in a conversion of this case to Chapter 7 or dismissal of the Chapter 11.

Only the votes of those creditors or interested parties whose ballots are timely received will be counted in determining whether a Class has accepted the Plan.

## II.    DEFINITIONS

The definitions set forth in Article I of the Plan apply in this Disclosure Statement except to the extent other definitions are set forth in this Disclosure Statement.

## III.    THE DEBTOR, BACKGROUND, AND EVENTS PRECIPITATING THE CHAPTER 11

### A.    <u>Background</u>

The Debtor is a Delaware limited liability company that was formed in February 2006. The Debtor is authorized to do business in Arizona. The Debtor's sole member is Raintree Corporate Center Holdings, LLC ("RCCH"). The Debtor's manager is Cavan Management Services, LLC ("CMS"). CMS is also RCCH's sole manager.

The Debtor owns and operates two Class "A" office buildings and the related corporate campuses known as Phase III and Phase IV of the Raintree Corporate Center located north of the northeast corner of Loop 101 (Pima Freeway) and Raintree Drive, at 8800 East Raintree Drive and 8888 East Raintree Drive, respectively, in Scottsdale, Arizona (the "Property"). Phase III of the Property consists of approximately 168,067 square fee and Phase IV of the Property consists of approximately 176,823 square feet. The Property is managed by CMS, a well-respected, established manager of commercial real estate throughout the Valley.

2784057.1
2790035.1

Phase III of the Property is currently occupied by 23 tenants in approximately 122,974 square feet of the building.  Thus, Phase III of the Property is approximately 73% occupied.[1]  Phase IV of the Property is currently occupied by 4 tenants in approximately 95,502 square feet of the building.  Thus, Phase IV of the Property is approximately 54% occupied.

iStar FM Loans, LLC ("iStar") has asserted a claim against the Debtor, secured by the Property, in the principal amount of approximately $76,708,398, which amount includes nearly $7 million in alleged "late charges."  The Debtor disputes that any such late charges are owed to iStar.

The Debtor has obtained an appraisal of the Property indicating a value of the Property, as of April 2010, of approximately $47.2 million.  Although the Debtor has not obtained a more recent appraisal, the Debtor's best estimate of the Property's value, as of January 2011, is approximately $47.2 million.

Prior to the Debtor's bankruptcy filing, iStar sought to collect rents from the Debtor's tenants.  The Debtor filed its voluntary bankruptcy petition in order to stay any such enforcement action.

**B.     Operations**

The Debtor has operated, and intends to continue operating, the Property as a Class "A" office building.  The Debtor continues to receive income from tenants to pay for the ordinary and necessary operating expenses of the Property, as well as any necessary repairs, from such income.  In fact, the Debtor and iStar have entered into a stipulation for the Debtor's use of iStar's asserted cash collateral pursuant to a budget, which has been approved by the Court (the "Budget").  The Budget reflects the current anticipated revenues and expenses relating to the Property.  The Debtor continues to market and lease vacant space in the Property and to renew existing leases when appropriate.

In order to provide for efficient and productive operations, and to keep the Debtor's business competitive, the Debtor intends to retain the same management team and structure that existed pre-petition.  The issues confronted by the Debtor that led to the bankruptcy filing were the

---

[1]  These figures do not include a new lease currently being negotiated with Navistar, Inc. for approximately 4,760 square feet of space in Phase III of the Property.

4

2784057.1
2790035.1

product of market changes, not the Debtor's management or its structure. Thus, a change in management structure is not in the best interests of the Debtor or its creditors because the existing structure is appropriate to meet the needs of the Debtor.

By maintaining its current management and operational structure, the Debtor will avoid the transactional costs associated with significant and unnecessary change. In addition, the institutional knowledge of the management team will be preserved.

Attached hereto as Exhibit "A" are the Debtor's projections of cash flow and payment of debt service in the event that iStar does not make the election under § 1111(b) of the Bankruptcy Code, reflecting the Debtor's sources and uses of cash (including (a) the Debtor's anticipated revenues, and the infusion of cash from the New Value contribution necessary to fund the Reserve Account, as discussed below, and (b) the Debtor's anticipated operating, tenant improvement, leasing commission and capital costs and expenses) for the approximately eight (8) year period following confirmation of the Plan. Exhibit "A" assumes an Allowed Secured Claim in favor of iStar in the amount of $47.2 million based upon the Debtor's current presumption of the approximate value of the Property. The final projections by the Debtor will depend upon the Court's ultimate determination of the allowed amount of iStar's secured claim.

Attached hereto as Exhibit "B" are the Debtor's projections of cash flow and payment of debt service in the event that iStar does make the election under § 1111(b) of the Bankruptcy Code. This exhibit consists of three pages—one page consisting of combined revenues and expenses for both buildings, one page consisting of the Schedule of Prospective Cash Flow for Building III, and one page consisting of the Schedule of Prospective Cash Flow for Building IV.

Finally, attached hereto as Exhibit "C" are (a) a summary of the assumptions used in connection with the Debtor's projections in Exhibits "A" and "B" and (b) supporting spreadsheets for the summary of assumptions, consisting of (i) a "Presentation Rent Roll & Current Term Tenant Summary" for each building, (ii) a projected "Occupancy Rate" chart for each building, and (iii) a "2nd Generation Market Leasing Assumption Results" chart reflecting the following assumptions incorporated into the Argus program used to prepare the Debtor's projections: renewal probability,

2784057.1
2790035.1

market rent $psf, months vacant, tenant improvement $psf, leasing commissions, rent abatements, and reimbursements.

### C. Preferences and Fraudulent Conveyances

To the extent that a preference or fraudulent conveyance occurred before the bankruptcy filing, such transfer may be recoverable by the bankruptcy estate for the benefit of the estate under §§ 544, 547, or 548 of the Bankruptcy Code. To date, no complaints have been filed under any of these theories, and the Debtor is not currently aware of any causes of action for the recovery of preferences or fraudulent conveyances. To the extent any such claims exist, they will be analyzed for their potential value to the estate. These potential claims are specifically preserved for the benefit of the bankruptcy estate. Any recovery that is obtained will be obtained for the benefit of the estate.

## IV. SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A. Administrative Proceedings

The Debtor filed its Petition for Relief under Chapter 11 on July 27, 2010, and a first meeting of creditors was held on August 31, 2010.

### B. Retention of Professionals

The Debtor retained Polsinelli Shughart, P.C. ("PS") to act as its original bankruptcy counsel. The Court signed an Order approving the retention of PS on September 17, 2010.

The Debtor retained Highland Financial Consulting, LLC ("CRO") to act as its Chief Restructuring Officer. The Court approved the retention of the CRO on November 9, 2010.

### C. Appointment of Unsecured Creditors Committee

The United States Trustee's Office filed a statement stating that, despite its efforts to contact unsecured creditors, it was unable to appoint a Committee of Unsecured Creditors.

### D. Motion and Stipulation and Use Cash Collateral

The Debtor filed a motion to use the revenues generated by the Property, which iStar asserts constitute its cash collateral, on July 29, 2010. Although iStar initially filed a limited objection to

2784057.1
2790035.1

the use of its asserted cash collateral, the Debtor and iStar resolved iStar's objections and entered into a stipulated order for the use of cash collateral which the Court entered on October 1, 2010. The Debtor and iStar have further agreed to the Debtor's use of asserted cash collateral through April 30, 2011.

### E. Operating Reports

The Debtor's monthly operating reports are current and copies can be obtained from the Court's electronic docket

## V. DESCRIPTION OF ASSETS AND LIABILITIES OF THE DEBTORS

### A. Assets

The values ascribed to the Debtor's assets below are based on the Debtor's best estimate and other factors such as the purchase price, comparable sales, tax assessments, and appraisals.

**1. Real Property** – ~~Between approximately $38 million and~~Approximately $47.2 million.

**2. Bank Accounts** – Approximately $274,202 as of the Petition Date. The Debtor has accumulated, and continues to accumulate, net cash from operations of the Property since the Petition Date. The current amount of cash held by the Debtor is reflected in the most recent Monthly Operating Report filed by the Debtor.

**3. Other Accounts and Deposits** – The Debtor owns certain security deposits, in the amount of $25,000 each, held by two of the Debtor's pre-petition professionals, Larsen Allen, LLP and Fennemore Craig, LLP.

**4. Accounts Receivable** – The Debtor owns certain accounts receivable from tenants for unpaid rent in the amount of approximately $52,452.46.

**5. Personal Property** – The Debtor owns certain personal property, consisting primarily of office equipment, model unit furniture, fixtures and computer software with an estimated book value of approximately $1,786,894.41. iStar asserts that this personal property constitutes part of its collateral. The Debtor asserts that the fair market value of the personal

2784057.1
2790035.1

property is, in context, negligible but will be determined by the Court as part of the confirmation hearing.

### B. <u>Liabilities</u>

The following is an overview of the Debtor's known liabilities.

### 1. Priority Claims

The Debtor is not aware of the existence of any pre-petition priority claims.

2784057.1
2790035.1

## 2. Secured Claims

a.      The Debtor's schedules list iStar as a secured creditor with a first position lien on the Property in the amount of approximately $68,507,872.31.  In the stipulated cash collateral order, iStar asserts that the amount owing on its secured claim is approximately $76,708,398.75 including late charges of nearly $7 million, as of the Petition Date.  The Debtor disputes iStar's asserted late charges.

b.      The Debtor's schedules list the law firm of Fennemore Craig as a secured creditor with a claim of approximately $2,600 secured by a cash retainer held by Fennemore Craig in the amount of $25,000.

c.      The Debtor's schedules list the accounting firm of Larson Allen as a secured creditor with a claim of approximately $2,940.00 secured by a cash retainer held by Larson Allen in the amount of $25,000.

d.      The Debtor's schedules list Sonoran Pacific Resources, LLP ("Sonoran Pacific") as a secured creditor with a claim of approximately $7,200, secured by certain furniture owned by the Debtor.  Prior to the Petition Date, the Debtor needed to furnish a model unit used to show the property to prospective tenants.  The Debtor suspected that it would be difficult to obtain authority to acquire such furniture after the bankruptcy petition was filed.  Further, the Debtor was aware of a party—Sonoran Pacific—who was willing to finance the Debtor's purchase of furniture in order to, among other things, allow the Debtor to conserve cash pre-petition.  Accordingly, the Debtor took advantage of this financing opportunity and entered into a loan arrangement with Sonoran Pacific whereby Sonoran Pacific agreed to loan funds to the Debtor to allow the Debtor to purchase the necessary furniture, and the Debtor agreed to grant Sonoran Pacific a purchase money security interest in the furniture.  The loan and the grant of the security interest occurred prior to the Petition Date, and Sonoran Pacific filed a UCC-1 Financing Statement on July 26, 2010 with the Arizona Secretary of State's Office.

2784057.1
2790035.1

iStar has asserted that Sonoran Pacific's security interest in the furniture is not properly perfected because the UCC-1 Financing Statement should have been filed in Delaware, where the Debtor was formed, not in Arizona. The Debtor has discussed this issue with counsel for Sonoran Pacific, and has determined that Sonoran Pacific's security interest was not properly perfected. Accordingly, Sonoran Pacific is not treated as a secured creditor in the Plan. Copies of the loan documents between the Debtor and Sonoran Pacific are available for inspection by contacting the Debtor's counsel.

**3.      Unsecured Claims**

According to the Debtor's Schedules of Assets and Liabilities, the total amount of unsecured claims, not including any deficiency claims of secured creditors, is $605,204.28 605,204.28, not including Sonoran Pacific's $7,200 claim. This amount includes tenant security deposits in the amount of approximately $219,354.04 claims owing to CMS in the total amount of $4,837.37, and a claim for reimbursement of tenant improvement costs, held by Laser Spine Institute in the amount of approximately $357,300.

**C.      Administrative Expenses**

The Debtor's administrative expenses consist of the fees and costs of attorneys and other professionals necessary to the Debtor's operations, bankruptcy case, and plan of reorganization. The fees and costs of these professionals will not be precisely known until the Bankruptcy Case is completed. However, as set forth below, the Debtor's professionals anticipate that either (a) the retainers they presently have will be sufficient to cover the services they have rendered, and will render, in the Bankruptcy Case, or (b) for those professionals that do not have retainers and will be paid by some other manner, their projected anticipated fees and costs for their services will be commensurate with their historical fees and costs incurred by the Debtor.

The Debtor's bankruptcy counsel is PS. PS is currently in possession of a retainer in the amount of $100,000. As of January 31, 2011, the total amount of fees and costs incurred by PS in its representation of the Debtor is $54,097.75. PS anticipates that, if this case proceeds to a

2784057.1
2790035.1

consensual resolution regarding the Debtor's Plan, PS' fees will be less than the amount of the retainer. However, in the event that confirmation of the Plan is contested, and depending upon the nature and extent of any objections, PS anticipates that its fees could exceed the retainer by $60,000 to $80,000. To the extent that PS's fees and costs exceed the amount of the retainer, PS's fees and costs will constitute administrative claims against the Debtor's Estate. Furthermore, if confirmation of the Plan is contested, and depending upon the nature and extent of any objections, the Debtor may need to retain expert witnesses in connection with any evidentiary matters presented to the Court. The Debtor anticipates that the fees and costs of such experts could range from $30,000 to $50,000 or more depending on the expert testimony required.

## VI.   PLAN SUMMARY

The following statements concerning the Plan are merely a summary of the Plan and are not complete. The statements are qualified entirely by express reference to the Plan. Creditors are urged to consult with counsel or each other in order to understand the Plan fully. The Plan is complete, inasmuch as it proposes a legally binding agreement by the debtor, and an intelligent judgment cannot be made without reading it in full. With the exception of the Classes 1-A through 1-C (the "Priority Claims"), all the creditors of the Debtor are impaired under the terms of the Plan. The Secured Creditors are impaired because they will be subjected to different treatment than they had originally contracted for with the Debtor. The Unsecured Creditors will be impaired because they will be subject to different treatment than they originally contracted for. Thus, the Debtor will have numerous classes with the right to vote on its Plan of reorganization, as set forth herein.

## VII.   CLASSIFICATION OF CLAIMS AND INTERESTS.

### A.   Class 1:  Priority Claims

1.   Class 1-A consists of Allowed Priority Claims under 11 U.S.C. § 503 and   § 507(a)(2) (Administrative Claims).

2.   Class 1-B consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(3) (Wage Claims).

2784057.1
2790035.1

3. Class 1-C consists of Allowed Priority Claims under 11 U.S.C. §507(a)(8) (Tax Claims).

**B.** **Class 2: Secured Claims**

1. Class 2-A consists of the Allowed Secured Claim of iStar.

2. Class 2-B consists of the Allowed Secured Claim of Maricopa County for real property taxes.

3. Class 2-C consists of the Allowed Secured Claim of Fennemore Craig.

4. Class 2-D consists of the Allowed Secured Claim of Larson Allen.

~~1. Class 2-E consists of the Allowed Secured Claim of Sonoran Pacific.~~

**C.** **Class 3: Allowed Claim of Laser Spine**

Class 3 consists of the Allowed Claim of Laser Spine relating to the Debtor's obligation to reimburse Laser Spine for tenant improvements made to Laser Spine's leased premises.

**D.** **Class 4: Tenant Security Deposits**

Class 4 consists of Allowed Claims by tenants for the return of tenant security deposits held by the Debtor.

**E.** **Class 5: Unsecured Claims**

Class 5 consists of the Allowed Unsecured Claims of Creditors not otherwise treated in the Plan.

**F.** **Class 6: Interest Holders**

Class 6 consists of all Allowed Interests of Interest Holders.

**VIII.** **IMPAIRMENT OF CLASSES.**

Classes 1-A, 1-B, and 1-C are unimpaired under the Plan. All other Classes are Impaired, as that term is defined in 11 U.S.C. § 1124.

**IX.** **TREATMENT OF CLASSES.**

**A.** **Class 1: Priority Claims**

1. **Class 1-A: Administrative Claims**

12

This Class consists of Allowed Priority Claims under 11 U.S.C. §§ 503 and 507(a)(2) – administrative priority claims. Unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Claims of Class 1-A shall be paid in full, in cash, on or before the Effective Date or as the same are Allowed and ordered paid by the Court. Any Class 1-A Claim not allowed as of the Effective Date shall be paid as soon thereafter as it is allowed by the Court according to the terms of this Class. This Class is not impaired.

### 2. Class 1-B: Wage Claims

This Class consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(4) – wage claims. As provided in 11 U.S.C. § 1129(a)(9)(B), unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Priority Claims of Class 1-B shall be paid in full, in cash, on or before the Effective Date. The Debtor does not believe that any claims exist under this Class. Any Class 1-B Claim not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class. This Class is not impaired.

### 3. Class 1-C: Tax Claims

This Class consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(8) – tax Claims which are not otherwise treated as secured claims herein. As provided in 11 U.S.C. § 1129(a)(9)(C), unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Priority Claims of Class 1-C shall be paid in full, in cash, on or before the Effective Date, or, at the Debtor's option, such Allowed Claims shall be paid, on account of such Allowed Claim, deferred cash payments, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim. Any Class 1-C Claims not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class. This Class is not impaired.

### B. Class 2: Secured Claims

### 1. Class 2-A – Allowed Secured Claims of iStar

2784057.1
2790035.1

This Class consists of the Allowed Secured Claim of iStar. This Class is impaired. iStar asserts that it has the right to make an election under § 1111(b) of the Bankruptcy Code. Accordingly, the following discussion sets forth alternate treatments of iStar's secured claim, depending upon whether iStar makes the § 1111(b) election or not.

### (i)    iStar's Treatment if the § 1111(b) Election is Not Made

If iStar does not make the § 1111(b) election, then pursuant to § 506(a)(1) of the Bankruptcy Code, the amount of iStar's Allowed Secured Claim shall be limited to the value of its collateral, which the Debtor believes to be ~~in the range of between approximately $38~~$47.2 million ~~and $47 million~~, as discussed above. The remainder of iStar's Allowed Claim shall be treated as a general unsecured claim in Class 5. The Debtor intends to pay iStar's Allowed Secured Claim in full, with interest at the Plan Rate, over a period of seven (7) years.

Specifically, the Debtor will execute and deliver to iStar a promissory note (the "New iStar Note") in the principal face amount of iStar's Allowed Secured Claim. The New iStar Note will mature and become fully due and payable on the 7th anniversary of the Effective Date (the "New iStar Note Maturity Date"). During the term of the New iStar Note, the Debtor will make monthly principal and interest payments to iStar based upon a 25 year amortization schedule with interest at the Plan Rate. On the New iStar Note Maturity Date, all remaining amounts of principal and interest due under the New iStar Note will be immediately due and payable, and will be paid by the Debtor to iStar either through a sale of the Real Property or through refinancing of the Real Property. The first payment of principal and interest will be made on the Effective Date, and each monthly payment thereafter will be made on the first business day of each month during the term of the New iStar Note.

The form of the New iStar Note will be substantially similar to the existing "Secured Promissory Note" note by the Debtor in favor of iStar's predecessor, Fremont Investment & Loan dated December 21, 2006 (the "Original Note"), except (i) the provisions of this Plan and the Confirmation Order relating to the principal amount of the New iStar Note, the interest payable on such principal amount, the term of the New iStar Note, and the timing of payments to iStar shall

2784057.1
2790035.1

supersede any contrary provisions of the Original Note; (ii) to the extent that any provisions of the Original Note are inconsistent with the terms of the Plan, the terms of the Plan and the Confirmation Order shall be substituted in the New iStar Note; and (iii) Articles 2, 3, and 4.3, all of which are either irrelevant and/or inconsistent with the terms of this Plan, shall not be included in the New iStar Note.

iStar will retain its existing lien on the property that served as collateral for iStar's Claim pre-petition until the New iStar Note has been satisfied in full. iStar's lien securing the New iStar Note shall be evidenced by:

(a) the existing "Deed of Trust and Fixture Filing" in favor of iStar's predecessor in interest and recorded on December 21, 2006 in the Official Records of the Maricopa County Recorder's Office at Document No. 20061668979 (the "Deed of Trust"), except (i) to the extent that any provisions of the Deed of Trust are inconsistent with the terms of the Plan, the terms of the Plan and the Confirmation Order shall control; and (ii) the Deed of Trust shall be modified to refer to the Debtor's obligations under the New iStar Note and this Plan, rather than the to the Original Note and/or any other pre-petition obligations of the Debtor to iStar or its predecessors-in-interest;

(b) the existing "Assignment of Rents (and Leases)" in favor of iStar's predecessor in interest and recorded on December 21, 2006 in the Official Records of the Maricopa County Recorder's Office at Document No. 20061668980 (the "Assignment of Rents"), except (i) to the extent that any provisions of the Assignment of Rents are inconsistent with the terms of the Plan, the terms of the Plan and the Confirmation Order shall control; and (ii) the Assignment of Rents shall be modified to refer to the Debtor's obligations under the New iStar Note and this Plan, rather than the to the Original Note and/or any other pre-petition obligations of the Debtor to iStar or its predecessors-in-interest; and

(c) a Security Agreement (the "New Security Agreement") in favor of iStar providing iStar with a security interest and lien in the same personal property in which iStar had a lien pre-petition and conforming substantially with the terms of Articles 4 and 5 of the Loan and Security Agreement between the Debtor and iStar's predecessor-in-interest dated December 21, 2006 (the

15

"Loan Agreement"), which New Security Agreement shall relate to and be perfected by any existing UCC-1 Financing Statements filed by iStar or its predecessor-in-interest.

Except for the Deed of Trust, the Assignment of Rents and the UCC-1 Financing Statements, all as modified by the Plan and Confirmation Order, any and all other documents relating to the pre-petition loan between iStar (and/or its predecessors-in-interest) and the Debtor, including the entire Loan Agreement (except Sections 6.10 and 7.5 which shall survive pursuant to Article 2.9 of the Deed of Trust) and the "Assignment of Project Documents" dated December 21, 2006, shall be deemed to be null and void and of no further force and effect.

At any time prior to the end of the term, the Debtor may pay the balance of the New iStar Note without penalty.

The Debtor anticipates that, during the first approximately 36 months following the Effective Date of the Plan, before the occupancy of the Real Property becomes stabilized, the Real Property may not generate sufficient net cash flow, after paying operating expenses, to make the full amount of monthly principal and interest payments payable under the New iStar Note (the "Monthly Note Payments"). Accordingly, on the Effective Date of the Plan, and as discussed below, RCCH or the Successful Bidder will deposit the New Value into an interest bearing reserve account (the "Reserve Account") which can be used to, among other things, pay any cash flow deficiency between the monthly net cash flow generated by the Real Property and the Monthly Note Payments during the term of the New iStar Note (a "Cash Flow Deficiency"), if any. To the extent that the use of the funds in the Reserve Accounts will result in the amount of funds in the Reserve Account being reduced to an amount below $200,000, at any time during the term of the New iStar Note, the Reorganized Debtor (from any retained excess cash flow) or RCCH, or the Successful Bidder, if any, (from an additional contribution of capital) will replenish the Reserve Account such that the Reserve Account shall always be maintained in the total amount of $200,000 until the New iStar Note matures.

2784057.1
2790035.1

The failure to maintain the Reserve Account in the total amount of at least $200,000 will constitute a default under the New iStar Note and the lien in the collateral securing the New iStar Note.

Immediately upon payment, in full, of the New iStar Note, iStar's Allowed Secured Claim, and its secured interest in the Real Property, will be deemed satisfied, extinguished, released and discharged, in full.

### (ii)    iStar's Treatment if the § 1111(b) Election is Made

If iStar makes the § 1111(b) election, then iStar's entire Allowed Claim will be treated as fully secured, and iStar will not have any claims in Class 5.

In this event, the Debtor will treat iStar's Allowed Claim as follows:

iStar will retain its lien on the Real Property and its other pre-petition collateral in the full amount of its Allowed Claim, as such Allowed Claim is determined by the Court. The lien in the Real Property and other collateral will be evidenced by the Deed of Trust, Assignment of Rents and New Security Agreement, as set forth above. Except for the Deed of Trust, the Assignment of Rents and the UCC-1 Financing Statements, all as modified by the Plan and Confirmation Order, any and all other documents relating to the pre-petition loan between iStar (and/or its predecessors-in-interest) and the Debtor, including the entire Loan Agreement (except Sections 6.10 and 7.5 which shall survive pursuant to Article 2.9 of the Deed of Trust) and the "Assignment of Project Documents" dated December 21, 2006, shall be deemed to be null and void and of no further force and effect.

For purposes of this analysis, the Debtor assumes that (i) iStar's Allowed Claim will be established at no more than $69,000,000, rather than the nearly $77,000,000 asserted by iStar in its pleadings filed in this case; and (ii) the value of iStar's collateral is $47.2 million. The actual amount of iStar's Allowed Claim, and the value of its collateral base, will be established by the Court. Attached hereto Exhibit "B" is a cash flow projection reflecting the proposed treatment of iStar's claim. The Court may determine that the loan amount and collateral value assumptions are different than those set forth in the projections; consequently, Exhibit "B" to the Disclosure

17

Statement is merely illustrative, and the final projections of cash flow may be adjusted accordingly following the Court's determinations of these variables.

The Reorganized Debtor will pay the total amount of iStar's Allowed Claim on or before the end of the seventh year following the Effective Date of the Plan as set forth in Exhibit "B" and generally described as follows:

(i) On the Effective Date, the Debtor will make a payment of $575,000 to iStar;

(ii) Each quarter thereafter the Debtor shall make payments of $575,000 each to iStar, for a total annual payment to iStar of $2,300,000 per year for a period of seven years (the "Pre-Payoff Period");

(iii) On or before the end of the seventh year following the Effective Date of the Plan (the "Pay-Off Date"), the Debtor will pay the remaining balance of iStar's Allowed Claim, assumed to be $55,200,000 (based upon an initial loan amount of $69,000,000), from either the sale of the Real Property or a refinancing of the Real Property.

Notwithstanding the foregoing payment schedule, the Reorganized Debtor shall have the right and ability to make additional principal reduction payments to iStar during the Pre-Payoff Period, without penalty, from excess cash flow, if any, from the operations of the Real Property, which payments will reduce the amount of iStar's Allowed Claim payable on the Pay-Off Date.

The foregoing repayment schedule reflects that iStar will receive an internal rate of return (*i.e.*, interest) at the rate of 6.3% per annum, based on the assumption that the value of iStar's collateral is $47.2 million and the allowed amount of its claim is $69 million.

In the event the Court finds that iStar's Allowed Claim is greater than $69,000,000 and/or that the value of iStar's collateral is more than $47.2 million, then (i) the stream of payments on iStar's claim will remain the same as set forth above but (ii) any balance of iStar's Allowed Claim remaining on the Pay-Off Date will be increased accordingly to ensure that iStar's internal rate of return will be at least 6.3%.

The Debtor anticipates that, during the first approximately 36 months following the Effective Date of the Plan, before the occupancy of the Real Property becomes stabilized, the Real

2784057.1
2790035.1

Property may not generate sufficient net cash flow, after paying operating expenses, to make the full amount of monthly payments called for in the foregoing payment schedule. Accordingly, just as with the Debtor's treatment of iStar's claim if iStar does not make the § 1111(b) election, on the Effective Date of the Plan, as part of the New Value infused by RCCH or the Successful bidder, if any, RCCH or the Successful Bidder will deposit the New Value into the Reserve Account, which can be used to, among other things, pay any cash flow deficiency between the net cash flow generated by the Real Property and the amounts due to iStar under the foregoing payment schedule, if any. To the extent that the use of the funds in the Reserve Accounts will result in the amount of funds in the Reserve Account being reduced to an amount below $200,000, at any time prior to the Pay-Off Date, the Reorganized Debtor (from any retained excess cash flow) or RCCH, or the Successful Bidder, if any, (from an additional contribution of capital) will replenish the Reserve Account such that the Reserve Account shall always be maintained in the total amount of $200,000 until the Pay-Off Date. The failure to maintain the Reserve Account in the total amount of at least $200,000 will constitute a default under the Plan and the loan documents contemplated herein. Further, any failure by the Debtor to make the payments set forth in the foregoing schedule, or to pay the remaining unpaid amount of iStar's Allowed Claim on the Pay-Off Date, will constitute a default under the Plan and the loan documents contemplated herein.

Immediately upon payment, in full, of iStar's Allowed Claim, iStar's secured interest in the Real Property and any other collateral securing its Allowed Claim will be deemed satisfied, extinguished, released and discharged, in full.

The Reorganized Debtor reserves its right and ability to sell or refinance the Real Property at any time during the Pre-Payoff Period, so long as the net sale or loan proceeds (after payment of costs of sale or loan) are sufficient to pay the remaining amount of iStar's Allowed Claim in full.

**2.     Class 2-B –Allowed Secured Claim of Maricopa County**

2784057.1
2790035.1

This Class consists of the Allowed Secured Claim of Maricopa County, Arizona ("Maricopa County"), if any, that is secured by a tax lien on the Real Property. This Class is impaired.

Commencing on the Effective Date, the Allowed Secured Claim of Maricopa County, if any, will be paid in equal quarterly payments of principal and interest over a term of 1 year. Interest will accrue and will be paid at the statutory rate plus 2%. The County will retain its existing secured interest in the Real Property until this claim has been satisfied in full.

If funds generated from the normal operations of the Real Property are insufficient to pay the secured real property tax claims as provided herein, the payments required herein to Maricopa County will be made from the New Value contributed by RCCH or the Successful Bidder, if any.

### 3. Class 2-C –Allowed Secured Claim of Fennemore Craig

This Class consists of the Allowed Secured Claim of Fennemore Craig in the amount of approximately $2,600. This Class is impaired.

Although the retention agreement between Fennemore Craig and the Debtor does not provide for the payment of interest on Fennemore Craig's claim, Fennemore Craig's Allowed Secured Claim shall include interest at the Plan Rate from the date that the amount due and owing to Fennemore Craig first became 60 days past due until the Effective Date of the Plan. On the Effective Date of the Plan, Fennemore Craig will be entitled to apply its collateral (consisting of a cash retainer) to the principal amount of Fennemore Craig's claim plus any such accrued interest. Regardless of the total amount of Fennemore Craig's claim, Fennemore Craig's application of its retainer to the principal amount of the claim and any accrued interest shall be deemed to be in full and final satisfaction of Fennemore Craig's claims against the Debtor. To the extent that the amount of the retainer is greater than the amount of Fennemore Craig's claim, including accrued interest, Fennemore Craig shall deliver any excess funds to the Debtor after application of the retainer to Fennemore Craig's claim.

### 4. Class 2-D –Allowed Secured Claim of Larson Allen

2784057.1
2790035.1

This Class consists of the Allowed Secured Claim of Larson Allen in the amount of approximately $2,940.00. This Class is impaired.

Although the retention agreement between Larson Allen and the Debtor provides for the payment of interest on Larson Allen's claim at the rate of 1.5% per month, Larson Allen's Allowed Secured Claim shall include interest at the Plan Rate from the date that the amount due and owing to Larson Allen first became 60 days past due until the Effective Date of the Plan. On the Effective Date of the Plan, Larson Allen will be entitled to apply its collateral (consisting of a cash retainer) to the principal amount of Larson Allen's claim plus any such accrued interest. Regardless of the total amount of Larson Allen's claim, Larson Allen's application of its retainer to the principal amount of the claim and any accrued interest shall be deemed to be in full and final satisfaction of Larson Allen's claims against the Debtor. To the extent that the amount of the retainer is greater than the amount of Larson Allen's claim, including accrued interest, Larson Allen shall deliver any excess funds to the Debtor after application of the retainer to Larson Allen's claim.

5. Class 2-E - Allowed Secured Claim of Sonoran Pacific

This Class consists of the Allowed Secured Claim of Sonoran Pacific in the amount of approximately $7,200.00. This Class is impaired.

Upon information and belief, the value of the furniture that serves as collateral for Sonoran Pacific's claim exceeds the amount of Sonoran Pacific's claim. Accordingly, Sonoran Pacific's claim is Oversecured. The Debtor intends to pay Sonoran Pacific's Allowed Secured Claim in full, with interest at the Plan Rate, over a period of twelve (12) months beginning on the Effective Date. Specifically, the Debtor shall make monthly principal and interest payments of $619.68 per month to Sonoran Pacific for a period of twelve (12) months until Sonoran Pacific's Allowed Secured Claim, plus interest, is paid in full. Sonoran Pacific shall retain its lien on the collateral that secured its claim pre-petition.

2784057.1
2790035.1

~~Immediately upon payment, in full, of Sonoran Pacific's Allowed Secured Claim, Sonoran Pacific's Allowed Secured Claim, and its secured interest in the furniture serving as its collateral, will be deemed satisfied, extinguished, released and discharged, in full.~~

### C. Class 3: Allowed Claim of Laser Spine

This Class consists of the Allowed Claim of Laser Spine for unreimbursed tenant improvement costs and expenses owing by the Debtor to Laser Spine in the amount of approximately $357,300 ("Laser Spine's Reimbursement Claim"). This Class is impaired.

Laser Spine's Reimbursement Claim shall not accrue interest. Laser Spine's Reimbursement Claim shall be satisfied and paid in full by Laser Spine setting off against the monthly rent owing by Laser Spine to the Debtor pursuant to the following schedule until Laser Spine's Reimbursement Claim is paid in full:

| | |
|---|---|
| Months 1-3 | $34,063.96 per month |
| Month 4 | $41,546.95 |
| Month 5 | $42,656.30 |
| Months 6-9 | $43,385.65 per month |
| Month 10 | $21,875.35 |

Once Laser Spine's Reimbursement Claim is paid in full, Laser Spine will no longer receive a rental credit on the rent due to the Reorganized Debtor.

### D. Class 4: Tenant Security Deposits

This Class consists of all Allowed Unsecured Claims of tenants for pre-petition security deposits held by the Debtor in the total aggregate amount of approximately $219,354.04. This Class is impaired.

The Reorganized Debtor shall retain its right and ability to determine whether and what extent a tenant is entitled to the return of its security deposit pursuant to the terms of the lease between the Debtor and the tenant and applicable state law. However, notwithstanding anything to the contrary in the lease between the Debtor and its tenants or in applicable law, valid and enforceable tenant security deposits will be paid to tenants within 90 days of the later of either (a)

~~2784057.1~~
2790035.1

the date that the Debtor determines the appropriate amount of the security deposit to be returned or (b) the date the tenant vacates its premises. This 90 day delay is necessary in order to ensure that the Debtor has sufficient funds on hand to return the security deposit to the tenant, either from the cash flow of the Real Property or from an infusion of cash from one or more of the New Interest Holders.

**E.    Class 5:  Unsecured Claims**

This Class consists of all Allowed Unsecured Claims of Creditors that are not specifically treated elsewhere in the Plan (*e.g.*, this Class does not include the Allowed Claim of Laser Spine, claims of tenants for security deposits, or any administrative or priority claims). If iStar does not make the § 1111(b) election, then iStar's unsecured deficiency claim—*i.e.*, the difference between the amount of iStar's Allowed Claim and the value of its collateral—will be included in this Class. If iStar makes the § 1111(b) election, then iStar will not have a deficiency claim, and will not participate in distributions to holders in this Class 5. This Class is impaired.

**(i)    Treatment of Allowed Unsecured Claims if iStar Does Not Make the § 1111(b) Election**

If iStar does not make the § 1111(b) election, then Allowed Unsecured Claims will be treated as follows:

If RCCH is the successful bidder at the auction discussed below, if any, RCCH and/or any other affiliates of the Debtor holding Unsecured Claims, including Cavan Management Services (the manager of RCCH) ("CMS"), will waive their Unsecured Claims against the Debtor and the Debtor's Estate, and will not participate in any distribution to Class 5 Claimants. However, if RCCH is not the successful bidder at the auction, then RCCH and/or any other affiliates of the Debtor holding Allowed Unsecured Claims against the Debtor, including CMS, shall participate in the distributions to this Class.

The Allowed Unsecured Claims in this Class will be treated as follows:

(i)    First, Allowed Unsecured Claims will share, pro-rata, in a distribution of the sum of $500,000 in cash (the "Unsecured Distribution Amount") paid by the Reorganized Debtor, from the New Value contribution, on the 90th day following the Effective Date of the Plan.

2784057.1
2790035.1

(ii)     Second, the Reorganized Debtor will issue to each holder of an Allowed Unsecured Claim its pro rata portion of a $3 million subordinated debenture payable to holders of Allowed Unsecured Claims (the "Subordinated Debenture").  The Subordinated Debenture will not accrue interest.  The Subordinated Debenture will be secured by a second position lien in and to the Real Property, subject only to real property taxes and the Allowed Secured Claim of iStar.  The Reorganized Debtor shall not be required to make periodic payments to the holders of the Subordinated Debenture.  However, the Subordinated Debenture will be fully due and payable on the 7th anniversary of the Effective Date of the Plan or upon the sale or refinancing of the Real Property.

RCCH, or the Successful Bidder, if any, will contribute the Unsecured Distribution Amount, as part of the New Value contribution, into an account created by the Reorganized Debtor for the receipt of such funds (the "Unsecured Reserve Account").

Upon their receipt of (a) their respective pro rata portions of the Unsecured Distribution Amount and (b) their pro rata distributions from the payment of the Subordinated Debenture, all Allowed Unsecured Claims in this Class shall be deemed paid and discharged in full.

**(ii)     Treatment of Allowed Unsecured Claims if iStar Does Make the § 1111(b) Election**

If iStar makes the § 1111(b) election, then Allowed Unsecured Claims will be treated as follows:

RCCH and/or any other affiliates of the Debtor holding Unsecured Claims, including CMS, will waive their Unsecured Claims against the Debtor and the Debtor's Estate, and will not participate in any distribution to Class 5 Claimants.

The Allowed Unsecured Claims in this Class (again, not including any claim by iStar, Laser Spine, or tenants for security deposits, which claims are treated elsewhere in this Plan) will be paid in full but without interest, by the Reorganized Debtor from the New Value contribution, on the 90th day following the Effective Date of the Plan.

2784057.1
2790035.1

Upon their receipt of the funds from the Reorganized Debtor, all Allowed Unsecured Claims in this Class shall be deemed paid and discharged in full.

**F.      Class 6:  Interest Holders**

Class 6 consists of all Allowed Interests of the Interest Holder in the Debtor.  The Debtor's Interest Holder is RCCH.  RCCH will purchase the equity interests in the Reorganized Debtor by the contribution of cash to the Reorganized Debtor, on the Effective Date, in the amount of $5,500,000.00[2] (*i.e.*, the New Value).  The New Value will be used to:

(a) pay the amount necessary to pay all Class 1 Allowed Priority Claims as set forth above;

(b) pay the amounts to Maricopa County as set forth above, to the extent that cash flow from the Real Property is insufficient to pay the taxes;

(c) pay the Unsecured Distribution Amount of $500,000, if iStar does not make the § 1111(b) election and/or the full amount of Class 5 claims if iStar does make the § 1111(b) election; and

(d) fund the Reserve Account to pay, as necessary, among other things, (1) debt service payments to iStar, to the extent that cash flow is insufficient to make debt service payments, (2) tenant improvements, (3) broker's commissions, and (4) other necessary and appropriate capital expenses of the Real Property to ensure that the value of the Real Property is maintained.

If the Court determines that, under the circumstances, the New Value to be contributed by RCCH is insufficient, or that other parties-in-interest should be allowed to bid for the equity interests in the Reorganized Debtor, then other interested parties may bid for the equity interests in the Reorganized Debtor by meeting all of the terms and conditions identified below.  Such bids shall be made pursuant to the following auction procedures and terms:

a.      The auction ("Auction") of the equity interests in the Reorganized Debtor, if any, will be set by the Court at the Confirmation Hearing and will be held ~~at the time of~~approximately thirty (30) after the Confirmation Hearing, in the courtroom, with the Court presiding over the bidding.

---

[2] The amount of the New Value may be adjusted, as and if necessary, depending upon the ultimate determination of the amount of iStar's Allowed Secured Claim.

2784057.1
2790035.1

b.    Any party wishing to bid on the equity interests of the Reorganized Debtor must satisfy the following requirements to be a "Qualified Bidder":

i.    The bidder must be a current Creditor or Interest Holder of the Debtor.  This requirement is necessary to avoid any potential registration or like requirements of any applicable securities laws or regulations.

ii.    The bidder must deposit $1,000,000 in cash ("Deposit") with the Debtor's counsel at least twenty-five days prior to the ~~Confirmation Hearing~~Auction.  Any Deposits will be returned to any unsuccessful bidder on the day following the ~~Confirmation Hearing~~Auction.  The Deposit, plus any additional amounts bid by the Successful Bidder at the auction for the equity interests in the Reorganized Debtor, will be delivered to the Reorganized Debtor on the Effective Date of the Plan.

iii.    At least twenty-five days prior to the ~~Confirmation Hearing~~Auction, all bidders must provide satisfactory evidence to the Debtor of their ability to make a cash payment to the Debtor, on the Effective Date of the Plan, in the amount of no less than $5,750,000.   To the extent that the Debtor contests the sufficiency of the evidence submitted regarding a bidder's ability to pay such amount, the evidence will be presented to the Court at the ~~Confirmation Hearing~~Auction, prior to bidding, and the Court will make a determination as to the sufficiency of the evidence and whether the bidder should be deemed to be a Qualified Bidder.

iv.    At least twenty-five days prior to the ~~Confirmation Hearing~~Auction, all bidders must provide satisfactory evidence to the Debtor of their ability to operate the Reorganized Debtor in such a manner as to satisfy the requirements of this Plan, including payments to administrative claimants, secured creditors and unsecured creditors, on the terms and conditions set forth herein.  To the extent that the Debtor contests the sufficiency of the evidence submitted regarding a bidder's ability to make payments as required by the Plan, the evidence will be presented to the Court at the ~~Confirmation Hearing~~Auction, prior

2784057.1
2790035.1

to bidding, and the Court will make a determination as to the sufficiency of the evidence and whether the bidder should be deemed to be a Qualified Bidder.

v.      At least twenty-five days prior to the ~~Confirmation Hearing~~Auction, all bidders must provide satisfactory evidence to the Debtor that they are authorized to do business in the State of Arizona, and have, or have the ability to obtain, any and all necessary permits and/or licenses to operate the Real Property.  To the extent that the Debtor contests the sufficiency of such evidence, the evidence will be presented to the Court at the ~~Confirmation Hearing~~Auction, prior to bidding, and the Court will make a determination as to the sufficiency of the evidence and whether the bidder should be deemed to be a Qualified Bidder.

c.      All bids for the interests in the Reorganized Debtor shall be in increments of no less than $250,000.

d.      In order for a Qualified Bidder's bid to be determined to be higher and better than the New Value to be contributed by RCCH as set forth above, the Qualified Bidder's bid must:

i.      Exceed, by at least $250,000, RCCH's bid; and

ii.     Provide that the Qualified Bidder will comply with and perform under the terms of this Plan, including the payments to creditors (including tenant security deposits) as provided herein.

e.      RCCH shall have the right and ability to bid at the auction.

Competing bids will be assessed by the Court for their relative merits including, but not limited to, the amount of the bid and the expertise of the would-be New Interest Holder to manage and guide the Reorganized Debtor after the Effective Date and to satisfy the requirements of this Plan, including its ability to make the payments to creditors required herein and to satisfy the assumed obligations as required herein.

On the Effective Date, if RCCH is not the successful bidder at the ~~auction~~Auction, then the Successful Bidder at the ~~auction~~Auction must deliver its cash bid to the Reorganized Debtor and, upon such delivery, the Successful Bidder will be deemed to hold the equity interests in the

27

Reorganized Debtor, subject to all terms and conditions of this Plan, including the obligations to other creditors as provided herein and the assumption of liabilities as provided herein.

## X. MEANS FOR EXECUTING THE PLAN.

### A. Funding

The Plan will be funded by operations of the Real Property and a capital infusion in the amount of the New Value by RCCH or the Successful Bidder, if an ~~auction~~Auction as described above is held. As a showing of good faith and commitment to the Plan, RCCH will place $250,000 in "escrow" in the trust account of the Debtor's bankruptcy counsel on or before the Confirmation Date. These funds will become a part of the Estate and will fund the New Value contribution obligations set forth herein at confirmation ***only in the event that*** RCCH is the successful bidder for the equity interests in the Reorganized Debtor. Additionally, these funds will only be available to, and become a part of, the Estate if a Confirmation Order confirming this Plan is entered and becomes a Final Order.

### B. Liquidation of Estate Property

The Debtor shall have the authority to retain such brokers, agents, counsel, or representatives as it deems necessary to market, lease and/or sell assets of the Reorganized Debtor.

### C. Management

The Plan will be implemented by the retention of the Debtor's existing management, CMS, or such other management that the Successful Bidder, if not RCCH, will employ. This implementation will also include the management and disbursement of the funds infused by RCCH, or the Successful Bidder, if any, as set forth above and in accordance with the terms of this Plan.

### D. Disbursing Agent

The Reorganized Debtor shall act as the Disbursing Agent under the Plan.

### E. Documentation of Plan Implementation

In the event any entity which possesses an Allowed Secured Claim or any other lien in any of the Debtor's property for which the Plan requires the execution of any documents to incorporate

~~2784057.1~~
2790035.1

the terms of the Plan, fails to provide a release of its lien or execute the necessary documents to satisfy the requirements of the Plan, the Debtor may record a copy of this Plan or the Confirmation Order with the appropriate governmental agency and such recordation shall constitute the lien release and creation of any necessary new liens to satisfy the terms of the Plan. If the Debtor deems advisable, it may obtain a further Order from the Court that may be recorded in order to implement the terms of the Plan.

### F.    New Obligations

Any Allowed Claims which are otherwise impaired herein, and which are paid in deferred payments, shall be a New Obligation of the Reorganized Debtor under the terms described herein and completely replace any pre-confirmation obligations of the Debtor.

## XI.    EFFECT OF CONFIRMATION.

Except as otherwise provided in the Plan or the Confirmation Order, Confirmation acts as a Discharge, effective as of Confirmation, of any and all debts of the Debtor that arose any time before the entry of the Confirmation Order including, but not limited to, all principal and all interest accrued thereon, pursuant to §1141(d)(1) of the Bankruptcy Code. The Discharge shall be effective as to each Claim, regardless of whether a Proof of Claim thereon was filed, whether the Claim is an Allowed Claim, or whether the Holder thereof votes to accept the Plan.

In addition, any pre-confirmation obligations of the Debtor dealt with in the Plan shall be considered New Obligations of the Debtor, and these New Obligations shall not be considered in default unless and until the Reorganized Debtor defaults on the New Obligations pursuant to the terms of the Plan. The New Obligations provided for in the Plan shall be in the place of, and completely substitute for, any pre-Confirmation obligations of the Debtor. Once the Plan is confirmed, the only obligations of the Debtor shall be such New Obligations as provided for under the Plan. Once the Plan is confirmed, any and all pre-petition defaults under any obligations of the Debtor shall be deemed cured.

## XII.    LIQUIDATION ANALYSIS

2784057.1
2790035.1

If the Plan is not confirmed, and the Debtor's assets were liquidated instead, it is likely that only iStar would recover anything from such liquidation, and all other creditors (other than Fennemore Craig, and Larson Allen ~~and Sonoran Pacific~~) will not recover anything from the Debtor or the Debtor's Estate. Indeed, the value of the Debtor's Property is less than the total amount of iStar's second claim. Furthermore, the Debtor's personal property is virtually worthless, and is likely covered by iStar's security interest in the Debtor's assets.

The Debtor's Plan provides a better recovery than such a liquidation, regardless of whether iStar makes the § 1111(b) election. First, if iStar makes the § 1111(b) election, unsecured claims in Class 5, other than related party claims, will be paid in full from the New Value contribution. If iStar does not make the election, then Allowed Unsecured Creditors will share in a pro rata distribution of $500,000 on the Effective Date and a pro rata interest in the Subordinated Debenture. Finally, under the Plan, iStar will recover either (a) the value of its collateral, plus a market rate of interest, plus its share of the Unsecured Distribution Amount and Subordinated Debenture, if it does not make the § 1111(b) election; or (b) cash payments in the total amount of its Allowed Claim if it makes the § 1111(b) election. Either of these treatments will result in a better recovery to iStar than if the Property were liquidated.

The following chart demonstrates the recoveries to Creditors in the event of a liquidation versus the Debtor's Plan:

| Creditor Class | Anticipated recovery under Plan if iStar makes § 1111(b) election | Anticipated recovery under Plan if iStar does not make § 1111(b) election | Recovery if Debtor's assets are liquidated |
|---|---|---|---|
| Class 2-A (iStar) | Full amount of Allowed Claim (est. $69 million), without interest, by the Pay-Off Date | Full amount of Allowed Secured Claim (est. $47.2 million), plus interest at Plan Rate, by 7th anniversary of Effective Date | Value of collateral, estimated, at $47.2 million before costs and expenses of operations prior to foreclosure and costs of sale |
| Class 2-B (Maricopa County) | Full amount of Allowed Secured Claim, plus interest at 2% over statutory rate, within one year of Effective Date | Full amount of Allowed Secured Claim, plus interest at 2% over statutory rate, within one year of Effective Date | Amount of secured claim upon lender's disposition of collateral to third party or exercise of statutory lien enforcement rights |
| Class 2-C | Full amount of Allowed | Full amount of Allowed | Amount of retainer on |

30

| | | | |
|---|---|---|---|
| (Fennemore Craig) | Secured Claim, plus interest at the Plan Rate, on Effective Date | Secured Claim, plus interest at the Plan Rate, on Effective Date | deposit |
| Class 2-D (Larson Allen) | Full amount of Allowed Secured Claim, plus interest at the Plan Rate, on Effective Date | Full amount of Allowed Secured Claim, plus interest at the Plan Rate, on Effective Date | Amount of retainer on deposit |
| ~~Class 2-E~~ ~~(Sonoran Pacific)~~ | ~~Full amount of Allowed Secured Claim, plus interest at the Plan Rate, within one year of Effective Date~~ | ~~Full amount of Allowed Secured Claim, plus interest at the Plan Rate, within one year of Effective Date~~ | ~~Value of collateral upon liquidation~~ |
| Class 3 (Laser Spine's Reimbursement Claim) | Full amount of the Laser Spine Reimbursement Claim within 10 months of Effective Date | Full amount of the Laser Spine Reimbursement Claim within 10 months of Effective Date | Nothing |
| Class 4 (Tenant Security Deposits) | Full amount of valid security deposits within 90 days of the later of either (a) the date that the Debtor determines the appropriate amount of the security deposit to be returned or (b) the date the tenant vacates its premises | Full amount of valid security deposits within 90 days of the later of either (a) the date that the Debtor determines the appropriate amount of the security deposit to be returned or (b) the date the tenant vacates its premises | Nothing |
| Class 5 (Unsecured Claims) | Payment in full on the Effective Date | Pro rata shares of (i) $500,000 on the Effective Date and (ii) $3 million subordinated debenture on 7th anniversary of Plan | Nothing |
| Class 6 (Interest Holders) | Ability to obtain interest in Reorganized Debtor in exchange for New Value contribution | Ability to obtain interest in Reorganized Debtor in exchange for New Value contribution | Nothing |

## XIII. TAX CONSEQUENCES

Pursuant to §1125(a)(1) of the Bankruptcy Code, the Debtor is to provide a discussion of the potential material tax consequences of the Plan to the Debtor, any successor to the Debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant Class to make an informed judgment about the Plan. However, the Debtor need not include such information about any other possible or proposed plan. In determining whether the Disclosure Statement provides adequate information, the Court shall consider the complexity of the case, the benefit of additional information to creditors and other

~~2784057.1~~
2790035.1

parties in interest, and the cost of providing additional information. The following discussion summarizes certain considerations that may affect the anticipated federal income tax consequences of the Plan's implementation to Creditors and to the Debtor. It does not address all federal income tax consequences of the Plan nor does it address the state or local income tax or other state or local tax consequences of the Plan's implementation to Creditors or to the Debtor.

This description of the federal income tax consequences of implementing the Plan is based on Debtor's interpretation of the applicable provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), the regulations promulgated thereunder, and other relevant authority. Debtor's interpretation, however, is not binding on the IRS or any court. The Debtor has not obtained, nor does it intend to obtain, a private letter ruling from the IRS, nor has the Debtor obtained an opinion of counsel with respect to any of these matters. The discussion below is general in nature and is not directed to the specific tax situation of any particular interested taxpayer. **For these reasons, all Creditors and the Interest Holder should consult with their own tax advisors as to the tax consequences of implementation of the Plan to them under applicable federal, state, and local tax laws.**

### A. Tax Consequences to the Debtor

In general, pursuant to IRC Section 108, the amount of any debt of a corporation that is partially or totally discharged pursuant to a Title 11 bankruptcy case is excluded from gross income. According to IRC Section 108(b), the amount of debt discharge income ("DDI") that is excluded from gross income must be applied to reduce the tax attributes of the Debtor. The Debtor's tax attributes are reduced in the following order: (1) net operating losses ("NOLs"); (2) general business credits; (3) minimum tax credit; (4) capital loss carryovers; (5) reduction in tax basis of the Debtor's property; (6) passive activity loss and credit carryovers; and (7) foreign tax credit carryovers. The Debtor may elect to apply the debt discharge exclusion first to depreciable property and thereafter to the tax attributes in the above-prescribed order.

### B. Tax Consequences to the Secured and Unsecured Creditors

2784057.1
2790035.1

Both the Secured Claimants and/or the Unsecured Claimants may be required to report income or be entitled to a deduction as a result of implementation of the Plan. The exact tax treatment depends on, among other things, each Claimant's method of accounting, the nature of each Claimant's claim, and whether and to what extent such Claimant has taken a bad debt deduction in prior taxable years with respect to the particular debt owed to it by one of the Debtors. **Each Holder of a secured claim or an unsecured claim is urged to consult with his, her, or its own tax advisor regarding the particular tax consequences of the treatment of his, her, or its claim under the Plan.**

**XIV.     OBJECTIONS TO AND ESTIMATIONS OF CLAIMS.**

      **A.     <u>Objections and Bar Date for Filing Objections</u>.**

As soon as practicable, but in no event later than 45 days after the Effective Date, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made pursuant to the Bankruptcy Code and the Bankruptcy Rules. Objections filed after such date will be barred.

2784057.1
2790035.1

**B.** **Settlement of Claims.**

Settlement of any objection to a Claim not exceeding $10,000 shall be permitted on the eleventh (11th) day after notice of the settlement has been provided to the Debtor, the Creditors, the settling party, and other persons specifically requesting such notice, and if on such date there is no written objection filed, such settlement shall be deemed approved. In the event of a written objection to the settlement, the settlement must be approved by the Court on notice to the objecting party.

**C.** **Estimation of Claims.**

For purposes of making distributions provided for under the Plan, all Claims objected to shall be estimated by the Disbursing Agent at an amount equal to (i) the amount, if any, determined by the Court pursuant to §502(c) of the Bankruptcy Code as an estimate for distribution purposes; (ii) an amount agreed to between the Debtor and the Claimant; or, (iii) that amount set forth as an estimate in the Plan or Disclosure Statement. Notwithstanding anything herein to the contrary, no distributions shall be made on account of any Claim until such Claim is an Allowed Claim.

**D.** **Unclaimed Funds and Interest.**

Distribution to Claimants shall be mailed by the Reorganized Debtor to the Claimants at the address appearing on the master mailing matrix unless the Claimant provides the Reorganized Debtor with an alternative address. For a period of one year from the date that a distribution was to be made by the disbursing agent but has gone uncollected by the Claimant, the disbursing agent shall retain any distributions otherwise distributable hereunder which remain unclaimed or as to which the disbursing agent has not received documents required pursuant to the Plan. Thereafter, the unclaimed funds shall be deposited in the appropriate distribution account for distribution to other Claimants entitled to participate in such respective fund.

**XV.** **NON-ALLOWANCE OF PENALTIES AND FINES.**

No distribution shall be made under the Plan on account of, and no Allowed Claim, whether Secured, Unsecured, Administrative, or Priority, shall include any fine, penalty, exemplary or punitive damages, late charges, default interest or other monetary charges relating to or arising

from any default or breach by the Debtor, and any Claim on account thereof shall be deemed Disallowed, whether or not an objection was filed to it.

## XVI. CLOSING OF CASE.

Until these cases are officially closed, the Reorganized Debtor will be responsible for filing pre- and post-confirmation reports required by the United States Trustee and paying the quarterly post-confirmation fees of the United States Trustee, in cash, pursuant to 28 U.S.C. §1930, as amended. Pursuant to 11 U.S.C. §1129(a)(12), all fees payable under §1930 of Title 28, as determined by the Court at the hearing on confirmation of the Plan, will be paid, in cash, on the Effective Date.

## XVII. MODIFICATION OF THE PLAN.

In addition to its modification rights under §1127 of the Bankruptcy Code, the Debtor may amend or modify the Plan at any time prior to Confirmation without leave of the Court. The Debtor may propose amendments and/or modifications of the Plan at any time subsequent to Confirmation with leave of the Court and upon notice to Creditors. After Confirmation of the Plan, the Debtor may, with approval of the Court, as long as it does not materially or adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies of the Plan, or in the Confirmation Order, if any may be necessary to carry out the purposes and intent of the Plan.

## XVIII. JURISDICTION OF THE COURT.

The Court will retain jurisdiction until the Plan has been fully consummated for, including but not limited to, the following purposes:

1. The classification of the Claims of any Creditors and the re-examination of any Claims which have been allowed for the purposes of voting, and for the determination of such objections as may be filed to the Creditor's Claims. The failure by the Debtor to object to or examine any Claim for the purpose of voting shall not be deemed to be a waiver of the Debtor's rights to object to or to re-examine the Claim in whole or in part.

2784057.1
2790035.1

2. To determine any Claims which are disputed by the Debtor, whether such objections are filed before or after Confirmation, to estimate any Un-liquidated or Contingent Claims pursuant to 11 U.S.C. § 502(c)(1) upon request of the Debtor or any holder of a Contingent or Un-liquidated Claim, and to make determination on any objection to such Claim.

3. To determine all questions and disputes regarding title to the assets of the Estate, and determination of all causes of action, controversies, disputes or conflicts, whether or not subject to action pending as of the date of Confirmation, between the Debtor and any other party, including but not limited to, any rights of the Debtor to recover assets pursuant to the provisions of the Bankruptcy Code.

4. The correction of any defect, the curing of any omission or any reconciliation of any inconsistencies in the Plan, or the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan.

5. The modification of the Plan after Confirmation, pursuant to the Bankruptcy Rules and the Bankruptcy Code.

6. To enforce and interpret the terms and conditions of the Plan.

7. The entry of an order, including injunctions, necessary to enforce the title, rights and powers of the Debtor, and to impose such limitations, restrictions, terms and conditions of such title, right and power that this Court may deem necessary.

8. The entry of an order concluding and terminating this case.

**XIX.    RETENTION AND ENFORCEMENT OF CLAIMS.**

Pursuant to §1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce any and all claims of the Debtor, except those claims specifically waived herein.  Any retained causes of action include, but are not limited to, all avoidance actions, fraudulent conveyance actions, preference actions, and other claims and causes of action of every kind and nature whatsoever, arising before the Effective Date which have not been resolved or disposed of

2784057.1
2790035.1

prior to the Effective Date, whether or not such claims or causes of action are specifically identified in the Disclosure Statement.

Any recovery obtained from retained causes of action shall become an additional asset of the Debtor, unless otherwise ordered by the Court, and shall be available for distribution in accordance with the terms of the Plan.

2784057.1
2790035.1

**XX.     EXECUTORY CONTRACTS.**

The Debtor hereby expressly assumes any and all tenant leases in existence as of the Confirmation Date and all executory contracts listed in the Debtor's Schedules of Assets and Liabilities. Every other executory contract and/or unexpired lease of the Debtor not expressly assumed by this Plan is hereby rejected.

Claims under § 502(g) of the Code arising as a result of the rejection of executory contracts or unexpired leases shall be filed no later than 30 days after the Confirmation Date. Any such Claims not timely filed and served shall be Disallowed.

**XXI.     REVESTING.**

Except as provided for in the Plan or in the Confirmation Order, on the Effective Date the Reorganized Debtor shall be vested with all the property of the Estate free and clear of all claims, liens, charges, and other interests of Creditors, arising prior to the Effective Date. Upon the Effective Date, the Reorganized Debtor shall operate their business free of any restrictions.

**XXII.     DISCLAIMER.**

Court approval of this Disclosure Statement and the accompanying Plan of Reorganization, is not a certification of the accuracy of the contents thereof. Furthermore, Court approval of these documents does not constitute the Court's opinion as to whether the Plan should be approved or disapproved.

**XXIII.     RISKS.**

The risk of the Plan lies with the Debtor's ability to fund the Plan and ultimately to refinance or sell the Property to pay off its creditors. If the funds to be infused by the Interest Holder are infused, this will lessen the risk accordingly. However, the success of the Debtor depends in large part on the recovery of the national economy over the next several years following confirmation.

**XXIV.     PROPONENTS RECOMMENDATION/ALTERNATIVES TO THE PLAN.**

The Debtor recommends that all creditors entitled to vote for the Plan do so. The Debtor's Plan will pay iStar the full amount of its secured claim and provide funds to pay unsecured

2784057.1
2790035.1

creditors. The alternatives to confirmation of the Plan would be either conversion of this case to a case under Chapter 7 of the Bankruptcy Code or its dismissal.

Dismissal of this case would result in the foreclosure of the Property by iStar. In such a case, Unsecured Creditors will receive nothing on account of their claims.

Conversion will result in the appointment of a Chapter 7 trustee and, most likely, the hiring of an attorney by the trustee. Expenses incurred in administering the Chapter 7 case would take priority in the right to payment over allowed, administrative expenses incurred in the Chapter 11 case. Both Chapter 7 and Chapter 11 administrative expenses take priority over the payment of unsecured claims without priority. In other words, conversion would likely decrease the net amount available to pay currently existing creditors.

The most likely effect of conversion of the case to a Chapter 7 would be a foreclosure on the Property by iStar, and, as a result, Unsecured Creditors would receive nothing.

For all these reasons, the Debtor urges you to vote to accept the Plan and to return your ballots in time to be counted.

DATED: ~~February 18,~~ April 19, 2011.

POLSINELLI SHUGHART PC

By: _____
John J. Hebert
Mark W. Roth
Philip R. Rudd
CityScape Plaza
One East Washington, Suite 1200
Phoenix, AZ 85004
*Attorneys for the Debtor*

**COPY** of the foregoing mailed (or served via electronic notification if indicated by an "*")
on ~~February 18,~~ April 19, 2011, to:

U.S. TRUSTEE'S OFFICE
230 N. 1st Avenue, Suite 204
Phoenix, AZ 85003

Susan G. Boswell * susan.boswell@quarles.com
QUARLES & BRADY LLP
One South Church Ave., Suite 1700
Tucson, AZ 85701-1621
    *Attorneys for iStar FM Loans LLC*

39

Peter A. Siddiqui * peter.siddiqui@kattenlaw.com

KATTEN MUCHIN ROSENMAN LLP

525 W. Monroe Street

Chicago, IL 60661-3693

*Attorneys for iStar FM Loans LLC*

~~Barbara L. Caldwell~~ ~~*bcaldwell@cpwlawyers.com~~Lori A. Lewis *
lewisl004@mail.maricopa.gov

~~CALDWELL, PADISH & WELLS, PLLC~~

~~7333 E. Doubletree Ranch Road, Suite 255~~

~~Scottsdale, AZ 85258~~

MARICOPA COUNTY OFFICE OF GENERAL
  LITIGATION SERVICES

301 W. Jefferson Street, Suite 3200

Phoenix, AZ 85003-2143

*Attorneys for Maricopa County Treasurer*

By: _____ /s/ Cathie Bernales _____

2784057.1
2790035.1

Document comparison by Workshare Professional on Tuesday, April 19, 2011 2:15:07 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://PHOENIX/2784057/1 |
| Description | PHOENIX-#2784057-v1-RCC_South--Amended_Disclosure_Statement_(with_1111(b)) |
| Document 2 ID | PowerDocs://PHOENIX/2790035/1 |
| Description | PHOENIX-#2790035-v1-RCC_SOUTH_3RD_Amended_DS |
| Rendering set | standard |

| Legend: |  |
|---|---|
| <span style="color:blue">Insertion</span> | |
| <span style="color:red">Deletion</span> | |
| <span style="color:green">Moved from</span> | |
| <span style="color:green">Moved to</span> | |
| Style change | |
| Format change | |
| <span style="color:brown">Moved deletion</span> | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 41 |
| Deletions | 44 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 87 |

# EXHIBIT A

| For the Years Ending | Year 1 Dec-2011 | Year 2 Dec-2012 | Year 3 Dec-2013 | Year 4 Dec-2014 | Year 5 Dec-2015 | Year 6 Dec-2016 | Year 7 Dec-2017 |
|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | |
| Base Rental Revenue | $ 6,072,770 | $ 7,084,379 | $ 8,232,656 | $ 8,473,955 | $ 8,439,204 | $ 8,629,052 | $ 8,886,236 |
| Absorption & Turnover Vacancy | $ (344,516) | $ (105,876) | $ (162,062) | $ (404,448) | $ (75,442) | $ (131,772) | $ (347,423) |
| Base Rent Abatements | $ | $ (527,106) | $ (777,353) | $ (582,625) | $ (458,002) | $ (181,628) | $ (655,645) |
| Scheduled Base Rental Revenue | $ 5,728,260 | $ 6,431,596 | $ 7,303,171 | $ 7,486,890 | $ 7,905,860 | $ 8,315,652 | $ 7,883,185 |
| Base Rental Step Revenue | $ 155,407 | $ 580,890 | $ 669,626 | $ 573,896 | $ 685,118 | $ 700,290 | $ 699,297 |
| | | | | | | | |
| **Expense Reimbursement Revenue** | | | | | | | |
| Real Estate Taxes | $ 33,704 | $ 49,711 | $ 65,065 | $ 51,271 | $ 54,462 | $ 57,521 | $ 52,327 |
| Insurance | $ 2,767 | $ 4,322 | $ 8,008 | $ 5,439 | $ 5,849 | $ 7,173 | $ 5,619 |
| Utilities | $ 14,381 | $ 23,237 | $ 33,204 | $ 32,597 | $ 35,374 | $ 43,120 | $ 32,051 |
| Janitorial | $ 8,051 | $ 9,399 | $ 13,146 | $ 11,900 | $ 12,929 | $ 15,911 | $ 11,829 |
| Repairs and Maintenance | $ 4,498 | $ 7,094 | $ 10,019 | $ 9,222 | $ 10,062 | $ 12,487 | $ 9,448 |
| HVAC | $ 1,034 | $ 1,667 | $ 2,333 | $ 2,096 | $ 2,290 | $ 2,834 | $ 2,150 |
| Landscape | $ 1,510 | $ 2,357 | $ 3,279 | $ 2,971 | $ 3,189 | $ 3,912 | $ 2,956 |
| Refuse Removal | $ 250 | $ 384 | $ 529 | $ 451 | $ 487 | $ 601 | $ 466 |
| Security and Fire | $ 2,097 | $ 3,920 | $ 4,683 | $ 4,383 | $ 4,703 | $ 5,749 | $ 4,325 |
| Elevator | $ 676 | $ 1,040 | $ 1,464 | $ 1,319 | $ 1,412 | $ 1,736 | $ 1,313 |
| Exterminator | $ 83 | $ 99 | $ 136 | $ 121 | $ 135 | $ 159 | $ 123 |
| Parking Lot | $ 125 | $ 162 | $ 234 | $ 166 | $ 176 | $ 220 | $ 173 |
| Property Management | $ 5,296 | $ 8,957 | $ 13,251 | $ 11,882 | $ 13,026 | $ 16,424 | $ 11,456 |
| Miscellaneous | $ 565 | $ 882 | $ 1,238 | $ 1,133 | $ 1,230 | $ 1,607 | $ 1,121 |
| Association Fees | $ 503 | $ 795 | $ 1,083 | $ 991 | $ 1,060 | $ 1,303 | $ 985 |
| Parking Garage | $ 3,402 | $ 5,279 | $ 7,304 | $ 6,490 | $ 6,999 | $ 8,575 | $ 6,497 |
| Total Reimbursement Revenue | $ 79,947 | $ 119,714 | $ 163,951 | $ 142,186 | $ 153,424 | $ 189,112 | $ 142,538 |
| | | | | | | | |
| Utility Reimb. | $ 93,256 | $ 104,056 | $ 110,569 | $ 114,610 | $ 118,717 | $ 119,097 | $ 120,699 |
| TI Reimbursement | $ 77,208 | $ 77,208 | $ 77,208 | $ 77,208 | $ 77,208 | $ 77,208 | $ 77,208 |
| Other | $ 9,200 | $ 9,180 | $ 9,384 | $ 9,551 | $ 9,742 | $ 9,937 | $ 10,135 |
| Parking Revenue | $ 202,519 | $ 240,984 | $ 288,722 | $ 297,519 | $ 316,053 | $ 320,545 | $ 319,802 |
| Total | $ 385,683 | $ 431,438 | $ 485,963 | $ 498,888 | $ 519,720 | $ 526,787 | $ 527,844 |
| | | | | | | | |
| Total Potential Gross Revenue | $ 6,347,297 | $ 7,562,047 | $ 8,622,611 | $ 8,701,875 | $ 9,163,122 | $ 9,831,541 | $ 9,141,944 |
| 5% General Vacancy | 0 | | (10,371) | (226,412) | (328,665) | (299,439) | (112,500) |
| (at 95% occupancy or Above) | | | | | | | |
| Effective Gross Revenue | 6,347,297 | 7,562,047 | 8,612,240 | 8,475,284 | 8,834,457 | 9,332,402 | 9,029,444 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Real estate taxes | $ 1,034,580 | $ 1,076,809 | $ 1,098,345 | $ 1,120,311 | $ 1,142,718 | $ 1,165,572 | $ 1,188,883 |
| Insurance | $ 119,814 | $ 116,090 | $ 118,412 | $ 120,780 | $ 123,196 | $ 125,660 | $ 128,172 |
| Utilities | $ 602,031 | $ 648,167 | $ 702,955 | $ 721,994 | $ 748,496 | $ 759,976 | $ 786,172 |
| Janitorial | $ 185,491 | $ 215,498 | $ 250,565 | $ 256,956 | $ 272,332 | $ 276,559 | $ 276,924 |
| Repairs & maintenance | $ 159,983 | $ 175,078 | $ 195,435 | $ 202,280 | $ 212,853 | $ 216,336 | $ 222,446 |
| HVAC | $ 36,408 | $ 40,026 | $ 44,381 | $ 45,879 | $ 48,264 | $ 49,552 | $ 50,603 |
| Grounds & landscape | $ 62,680 | $ 63,322 | $ 64,588 | $ 65,890 | $ 67,198 | $ 68,542 | $ 69,913 |
| Refuse Removal | $ 9,463 | $ 9,652 | $ 9,945 | $ 10,042 | $ 10,243 | $ 10,448 | $ 10,656 |
| Elevator | $ 27,691 | $ 29,143 | $ 29,706 | $ 29,260 | $ 29,866 | $ 30,463 | $ 31,073 |
| Exterminating | $ 2,537 | $ 2,639 | $ 2,691 | $ 2,745 | $ 2,799 | $ 2,855 | $ 2,913 |
| Security and Fire | $ 91,527 | $ 93,358 | $ 95,225 | $ 97,130 | $ 99,072 | $ 101,054 | $ 103,075 |
| Parking Lot | $ 3,405 | $ 3,473 | $ 3,543 | $ 3,613 | $ 3,686 | $ 3,759 | $ 3,835 |
| Property Management | $ 190,419 | $ 226,862 | $ 258,672 | $ 261,060 | $ 274,695 | $ 269,956 | $ 274,256 |
| Parking Garage | $ 133,134 | $ 136,811 | $ 140,624 | $ 142,582 | $ 147,159 | $ 149,997 | $ 152,591 |
| Association Fees | $ 20,993 | $ 21,108 | $ 21,529 | $ 21,960 | $ 22,399 | $ 22,848 | $ 23,304 |
| Misc. expenses | $ 18,474 | $ 20,976 | $ 24,030 | $ 24,893 | $ 25,954 | $ 26,370 | $ 26,459 |
| Total Operating Expenses | $ 2,922,595 | $ 2,878,989 | $ 3,060,153 | $ 3,128,528 | $ 3,228,880 | $ 3,300,898 | $ 3,333,277 |
| | | | | | | | |
| Net Operating Income | 3,854,602 | 4,683,058 | 5,552,087 | 5,346,736 | 5,605,577 | 6,031,504 | 5,696,167 |
| | | | | | | | |
| Debt Service $69 Million - 30 Year | $ 2,300,000 | $ 2,300,000 | $ 2,300,000 | $ 2,300,000 | $ 2,300,000 | $ 2,300,000 | $ 2,300,000 |
| | | | | | | | |
| **Leasing & Capital Costs** | | | | | | | |
| Tenant Improvements | $ 1,946,200 | $ 1,695,430 | $ 2,551,651 | $ 788,460 | $ 581,503 | $ 407,527 | $ 1,142,572 |
| Leasing Commissions | $ 397,432 | $ 474,234 | $ 650,309 | $ 437,521 | $ 254,451 | $ 171,111 | $ 466,297 |
| Asset Management Fees | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 |
| Capital Improvements | $ 30,000 | $ 37,500 | $ 56,250 | $ 84,375 | $ 126,563 | $ 154,154 | $ 158,778 |
| Total Leasing & Capital Costs | $ 2,675,632 | $ 2,507,164 | $ 3,558,210 | $ 1,608,376 | $ 1,262,517 | $ 1,032,592 | $ 2,069,747 |
| | | | | | | | |
| Cash Flow | $ (1,321,030) | $ (124,106) | $ (306,123) | $ 1,437,360 | $ 2,043,060 | $ 2,698,912 | $ 1,326,420 |
| | | | | | | | |
| $5.5 Million Capital and Interest Reserve | $ 4,178,970 | $ 4,054,864 | $ 3,748,741 | $ 5,186,100 | $ 7,229,160 | $ 9,927,772 | $ 11,254,192 |
| | | | | | | | |
| Building Value At 8% Cap Rate | 45,682,525 | 58,538,225 | 69,401,083 | 66,821,694 | 70,069,716 | 75,393,794 | 71,202,084 |
| | | | | | | | |
| LTV (less available cash) | 148.0% | 110.0% | 89.5% | 89.5% | 82.1% | 73.2% | 74.3% |
| | | | | | | | |
| Beginning Balance | $ 69,000,000 | $ 66,700,000 | $ 64,400,000 | $ 62,100,000 | $ 59,800,000 | $ 57,500,000 | $ 55,200,000 |
| Principal Paydown | $ 2,300,000 | $ 2,300,000 | $ 2,300,000 | $ 2,300,000 | $ 2,300,000 | $ 2,300,000 | $ 2,300,000 |
| Ending Balance | $ 66,700,000 | $ 64,400,000 | $ 62,100,000 | $ 59,800,000 | $ 57,500,000 | $ 55,200,000 | $ 52,900,000 |
| (47,200,000) | 2,300,000 | 2,300,000 | 2,300,000 | 2,300,000 | 2,300,000 | 2,300,000 | 55,200,000 | 8.30% |

# EXHIBIT B

Raintree Corp Center III
Schedule Of Prospective Cash Flow

| For the Years Ending | Year 1 Dec-2011 | Year 2 Dec-2012 | Year 3 Dec-2013 | Year 4 Dec-2014 | Year 5 Dec-2015 | Year 6 Dec-2016 | Year 7 Dec-2017 | Year 8 Dec-2018 |
|---|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | | |
| Base Rental Revenue | $3,205,479 | $3,551,286 | $3,925,055 | $3,915,299 | $3,882,904 | $3,967,932 | $4,203,483 | $4,427,245 |
| Absorption & Turnover Vacancy | | (105,875) | (123,111) | (404,448) | (43,186) | (106,087) | (176,762) | (179,298) |
| Base Rent Abatements | (161,771) | (188,721) | (332,087) | (552,368) | (360,134) | (176,044) | (452,673) | (310,162) |
| | | | | | | | | |
| Scheduled Base Rental Revenue | 3,043,708 | 3,256,690 | 3,469,857 | 2,958,483 | 3,479,584 | 3,685,801 | 3,574,018 | 3,937,785 |
| Base Rental Step Revenue | 284,349 | 465,503 | 501,861 | 338,897 | 273,060 | 314,818 | 195,380 | 143,868 |
| | | | | | | | | |
| **Expense Reimbursement Revenue** | | | | | | | | |
| Real Estate Taxes | 33,704 | 46,320 | 57,647 | 34,012 | 35,222 | 44,706 | 36,584 | 40,321 |
| Insurance | 2,767 | 3,601 | 4,732 | 2,790 | 2,891 | 3,671 | 3,001 | 3,311 |
| Utilities | 14,361 | 19,760 | 24,707 | 14,533 | 15,299 | 19,292 | 15,758 | 17,347 |
| Janitorial | 6,051 | 8,316 | 10,447 | 6,122 | 6,620 | 8,207 | 6,690 | 7,361 |
| Repairs and Maintenance | 4,498 | 6,240 | 7,898 | 4,877 | 4,986 | 6,354 | 5,239 | 5,820 |
| HVAC | 1,084 | 1,471 | 1,857 | 1,107 | 1,179 | 1,499 | 1,241 | 1,374 |
| Landscape | 1,510 | 2,073 | 2,582 | 1,527 | 1,577 | 2,000 | 1,637 | 1,806 |
| Refuse Removal | 250 | 344 | 433 | 252 | 262 | 336 | 272 | 303 |
| Security and Fire | 2,097 | 2,880 | 3,595 | 2,117 | 2,193 | 2,778 | 2,273 | 2,509 |
| Elevator | 670 | 923 | 1,146 | 679 | 699 | 689 | 727 | 800 |
| Exterminator | 63 | 88 | 106 | 59 | 67 | 80 | 67 | 75 |
| Parking Lot | 125 | 174 | 217 | 124 | 131 | 169 | 137 | 148 |
| Property Management | 5,296 | 8,016 | 10,503 | 5,029 | 5,791 | 7,697 | 5,817 | 6,790 |
| Miscellaneous | 568 | 775 | 977 | 571 | 609 | 766 | 621 | 688 |
| Association Fees | 503 | 691 | 869 | 509 | 523 | 686 | 545 | 602 |
| Parking Garage | 3,402 | 4,579 | 5,835 | 3,439 | 3,583 | 4,539 | 3,719 | 4,088 |
| | | | | | | | | |
| Total Reimbursement Revenue | 76,947 | 106,551 | 133,631 | 77,547 | 81,502 | 103,651 | 84,322 | 93,343 |
| | | | | | | | | |
| Other Rental Income | 9,000 | 9,180 | 9,364 | 9,551 | 9,742 | 9,937 | 10,135 | 10,338 |
| Utilities Reimbursement | 12,000 | 12,240 | 12,485 | 12,734 | 12,989 | 13,249 | 13,514 | 13,784 |
| Parking Revenue | 112,254 | 126,024 | 141,832 | 136,779 | 153,279 | 154,220 | 155,076 | 156,387 |
| | | | | | | | | |
| Total Potential Gross Revenue | 3,538,258 | 3,977,188 | 4,268,730 | 3,534,071 | 4,010,146 | 4,281,474 | 4,032,445 | 4,357,505 |
| General Vacancy | 0 | 0 | (10,371) | 0 | (138,949) | (97,489) | (45,111) | (54,717) |
| | | | | | | | | |
| Effective Gross Revenue | 3,538,258 | 3,977,188 | 4,258,359 | 3,534,071 | 3,871,197 | 4,183,985 | 3,987,334 | 4,302,788 |
| | | | | | | | | |
| **Operating Expenses** | | | | | | | | |
| Real Estate Taxes | 675,829 | 689,142 | 702,925 | 716,983 | 731,323 | 745,949 | 760,868 | 776,086 |
| Insurance | 55,482 | 56,571 | 57,703 | 58,857 | 60,034 | 61,235 | 62,459 | 63,709 |
| Utilities | 268,792 | 262,823 | 300,246 | 298,761 | 317,080 | 321,570 | 326,272 | 332,969 |
| Janitorial | 105,700 | 114,769 | 126,519 | 123,834 | 135,411 | 138,711 | 137,974 | 140,872 |
| Repairs and Maintenance | 82,498 | 88,396 | 95,761 | 96,009 | 103,616 | 105,898 | 108,312 | 111,633 |
| HVAC | 19,497 | 20,894 | 22,634 | 22,693 | 24,467 | 25,030 | 25,601 | 26,336 |
| Landscape | 30,252 | 30,857 | 31,474 | 32,104 | 32,746 | 33,401 | 34,069 | 34,750 |
| Refuse Removal | 5,042 | 5,143 | 5,246 | 5,351 | 5,458 | 5,567 | 5,678 | 5,792 |
| Security and Fire | 42,017 | 42,857 | 43,714 | 44,589 | 45,480 | 46,390 | 47,318 | 48,264 |
| Elevator | 13,445 | 13,714 | 13,989 | 14,268 | 14,554 | 14,845 | 15,142 | 15,444 |
| Exterminator | 1,261 | 1,288 | 1,311 | 1,338 | 1,364 | 1,392 | 1,420 | 1,448 |
| Parking Lot | 2,521 | 2,571 | 2,623 | 2,675 | 2,729 | 2,783 | 2,839 | 2,896 |
| Property Management | 106,148 | 119,316 | 128,062 | 106,022 | 120,305 | 128,444 | 120,973 | 130,725 |
| Miscellaneous | 9,665 | 10,712 | 11,806 | 11,558 | 12,838 | 12,760 | 12,878 | 13,148 |
| Association Fees | 10,084 | 10,286 | 10,491 | 10,701 | 10,915 | 11,134 | 11,356 | 11,583 |
| Parking Garage | 65,941 | 66,274 | 71,017 | 71,677 | 74,497 | 75,721 | 77,021 | 78,581 |
| | | | | | | | | |
| Total Operating Expenses | 1,494,144 | 1,557,611 | 1,625,523 | 1,618,420 | 1,692,456 | 1,728,930 | 1,750,180 | 1,794,286 |
| | | | | | | | | |
| Net Operating Income | 2,044,114 | 2,419,577 | 2,632,836 | 1,915,651 | 2,178,741 | 2,455,055 | 2,237,154 | 2,508,502 |
| | | | | | | | | |
| **Leasing & Capital Costs** | | | | | | | | |
| Tenant Improvements | 806,100 | 310,030 | 950,591 | 786,480 | 438,864 | 407,627 | 708,297 | 678,320 |
| Leasing Commissions | 164,444 | 183,280 | 289,562 | 457,521 | 187,831 | 167,042 | 293,975 | 299,383 |
| Asset Management Fee | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| Capital Improvements | 15,000 | 22,500 | 33,750 | 50,625 | 75,938 | 78,216 | 80,582 | 82,979 |
| | | | | | | | | |
| Total Leasing & Capital Costs | 1,135,544 | 665,810 | 1,423,903 | 1,424,626 | 847,423 | 802,885 | 1,232,834 | 1,210,682 |
| | | | | | | | | |
| Cash Flow | $908,570 | $1,753,767 | $1,208,933 | $491,025 | $1,331,318 | $1,652,170 | $1,004,320 | $1,297,820 |

Raintree Corp Center IV
Schedule Of Prospective Cash Flow

| For the Years Ending | Year 1 Dec-2011 | Year 2 Dec-2012 | Year 3 Dec-2013 | Year 4 Dec-2014 | Year 5 Dec-2015 | Year 6 Dec-2016 | Year 7 Dec-2017 | Year 8 Dec-2018 |
|---|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | | |
| Base Rental Revenue | $2,867,291 | $3,513,093 | $4,307,501 | $4,558,697 | $4,558,300 | $4,561,120 | $4,692,753 | $4,874,553 |
| Absorption & Turnover Vacancy | | | (28,941) | | (32,256) | (25,685) | (170,631) | (182,861) |
| Base Rent Abatements | (182,739) | (340,388) | (445,246) | (30,467) | (98,768) | (5,584) | (232,975) | (358,090) |
| Scheduled Base Rental Revenue | 2,684,552 | 3,172,705 | 3,833,314 | 4,528,230 | 4,427,276 | 4,529,851 | 4,289,147 | 4,333,602 |
| Base Rental Step Revenue | (128,942) | 114,997 | 187,885 | 234,901 | 310,088 | 385,674 | 412,917 | 414,813 |
| **Expense Reimbursement Revenue** | | | | | | | | |
| Real Estate Taxes | | 3,391 | 8,318 | 17,259 | 19,280 | 22,813 | 15,743 | 12,949 |
| Insurance | | 521 | 1,276 | 2,649 | 2,958 | 3,502 | 2,418 | 1,989 |
| Utilities | | 3,477 | 8,587 | 18,064 | 20,105 | 23,828 | 16,293 | 13,406 |
| Janitorial | | 1,083 | 2,699 | 5,778 | 6,409 | 7,604 | 5,139 | 4,231 |
| Repairs & Maintenance | | 854 | 2,131 | 4,545 | 5,106 | 6,113 | 4,209 | 3,498 |
| HVAC | | 186 | 468 | 991 | 1,111 | 1,335 | 919 | 764 |
| Landscape | | 264 | 697 | 1,444 | 1,612 | 1,912 | 1,319 | 1,083 |
| Refuse | | 40 | 96 | 199 | 225 | 265 | 184 | 150 |
| Elevator | | 126 | 308 | 640 | 713 | 847 | 586 | 483 |
| Exterminator | | 13 | 30 | 62 | 69 | 79 | 56 | 46 |
| Fire & Safety | | 440 | 1,083 | 2,248 | 2,510 | 2,971 | 2,052 | 1,685 |
| Parking Lot | | 8 | 17 | 42 | 44 | 51 | 36 | 30 |
| Parking Garage | | 599 | 1,469 | 3,051 | 3,407 | 4,036 | 2,784 | 2,290 |
| Association | | 95 | 234 | 482 | 537 | 637 | 440 | 362 |
| Property Management | | 939 | 2,746 | 6,633 | 7,235 | 8,727 | 5,638 | 4,583 |
| Miscellaneous | | 107 | 261 | 582 | 621 | 741 | 500 | 416 |
| Total Reimbursement Revenue | 0 | 12,163 | 30,420 | 64,649 | 71,922 | 85,461 | 58,316 | 47,963 |
| Utilities Reimbursement | 86,256 | 91,818 | 98,184 | 101,876 | 103,728 | 105,848 | 107,185 | 109,309 |
| Hypercom TI | 77,208 | 77,208 | 77,208 | 77,208 | 77,208 | 77,208 | 77,208 | 77,208 |
| Parking Revenue | 89,965 | 115,870 | 146,690 | 160,740 | 162,774 | 166,325 | 164,728 | 167,698 |
| **Total Potential Gross Revenue** | 2,809,039 | 3,584,859 | 4,353,881 | 5,187,604 | 5,162,976 | 5,350,367 | 5,109,499 | 5,150,993 |
| General Vacancy | 0 | 0 | 0 | (226,412) | (189,716) | (201,951) | (67,389) | (85,024) |
| **Effective Gross Revenue** | 2,809,039 | 3,584,859 | 4,353,881 | 4,941,193 | 4,963,260 | 5,148,416 | 5,042,110 | 5,065,869 |
| **Operating Expenses** | | | | | | | | |
| Real Estate Taxes | 359,951 | 387,667 | 395,420 | 403,328 | 411,395 | 419,623 | 428,015 | 436,576 |
| Insurance | 59,352 | 59,619 | 60,709 | 61,923 | 63,162 | 64,425 | 65,713 | 67,026 |
| Utilities | 333,239 | 365,334 | 402,689 | 422,203 | 429,416 | 438,308 | 441,900 | 450,809 |
| Janitorial | 80,791 | 100,717 | 124,366 | 135,105 | 136,921 | 139,878 | 138,950 | 141,838 |
| Repairs & Maintenance | 77,510 | 87,682 | 99,874 | 108,271 | 109,066 | 112,437 | 114,134 | 117,516 |
| HVAC | 16,911 | 19,131 | 21,747 | 23,186 | 23,797 | 24,532 | 24,902 | 25,640 |
| Landscape | 31,828 | 32,465 | 33,114 | 33,776 | 34,452 | 35,141 | 35,844 | 36,561 |
| Refuse | 4,421 | 4,509 | 4,599 | 4,691 | 4,785 | 4,881 | 4,978 | 5,078 |
| Elevator | 14,146 | 14,429 | 14,717 | 15,012 | 15,312 | 15,618 | 15,931 | 16,249 |
| Exterminator | 1,326 | 1,353 | 1,380 | 1,407 | 1,435 | 1,464 | 1,493 | 1,523 |
| Fire & Safety | 49,510 | 50,501 | 51,511 | 52,541 | 53,592 | 54,664 | 55,757 | 56,872 |
| Parking Lot | 884 | 902 | 920 | 938 | 957 | 976 | 996 | 1,016 |
| Parking Garage | 67,193 | 68,537 | 69,907 | 71,305 | 72,732 | 74,186 | 75,670 | 77,183 |
| Association | 10,609 | 10,822 | 11,038 | 11,259 | 11,484 | 11,714 | 11,948 | 12,187 |
| Property Management | 84,271 | 107,546 | 130,617 | 155,028 | 154,590 | 160,511 | 153,285 | 154,527 |
| Miscellaneous | 8,609 | 10,264 | 12,222 | 13,135 | 13,326 | 13,610 | 13,581 | 13,845 |
| **Total Operating Expenses** | 1,198,551 | 1,321,978 | 1,434,630 | 1,511,108 | 1,536,424 | 1,571,968 | 1,583,097 | 1,614,046 |
| **Net Operating Income** | 1,610,488 | 2,283,481 | 2,919,251 | 3,430,085 | 3,426,836 | 3,576,448 | 3,459,013 | 3,471,823 |
| **Leasing & Capital Costs** | | | | | | | | |
| Tenant Improvements | 1,142,100 | 1,365,400 | 1,601,050 | | 147,849 | | 434,375 | 665,526 |
| Leasing Commissions | 232,988 | 290,954 | 360,757 | | 66,620 | 4,089 | 174,322 | 294,181 |
| Asset Management | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| Capital Improvements | 15,000 | 15,000 | 22,500 | 33,750 | 50,625 | 75,938 | 78,216 | 80,562 |
| **Total Leasing & Capital Costs** | 1,540,088 | 1,841,354 | 2,134,307 | 183,750 | 415,094 | 230,027 | 836,913 | 1,190,269 |
| **Cash Flow** | $70,400 | $422,127 | $784,944 | $3,246,335 | $3,011,742 | $3,346,441 | $2,622,100 | $2,281,554 |

**EXHIBIT C**

Raintree South Summary of Assumptions

- The § 1111b calculation is based upon a $69 million loan with a 30-year amortization with the sale of the project occurring in year 7, resulting in a 6.3% discount rate
- The new equity contribution to the project is estimated to be approximately $5.5M
- The loan to value steadily decreases over time from 146.0% as of the effective date, reaching 74.3% in year 7 - $71.2M building value with an 8.0% cap rate and a principal balance of 52.9M (If the project is refinanced in year 7, there is working capital available to meet a potentially lower LTV requirement)
- The program Argus was used in forecasting the financial projections
- All existing lease data was input with all assumptions calculated from that point forward; the existing lease data is set forth in the attached schedules entitled "Presentation Rent Roll & Current Term Tenant Summary"
- The initial lease up of the buildings is projected to occur over the next 3 years with rental rates ~~between $20-$25 PSF~~ going forward as reflected in the attached schedules, based upon the tenant improvement work needed, date leased and the suite location, all as set forth in the attached schedules of assumptions. The Debtor believes that the rental rates, both current and prospective, reflected in the attached schedules are reasonable and appropriate and accurately reflect market rental rates and anticipated market rental rates.
- There is approximately 114,443 square feet of shell space budgeted for $50 TI's which are projected to generate rental rates of $23-$25 PSF based on when the space is leased up
- There is about 13,197 square feet of spec space in suites (125, 135, 140, 185 and 190 in RC3) that didn't need TI's which are anticipated to be leased at $20 PSF rental rates
- All 3-year leases are projected to have $0.50 annual bumps and all 5-year leases are projected to have $1.00 annual bumps
- The probability for renewal is 50% in the first 3 years and stabilizes at 75% in the later years
- All 2nd generation leases start with an assumed $21 rental rate in 2011 and increase 5% on an annual basis
- If a tenant did not renew, the assumption is the suites would remain 2 months vacant on 1-year leases, 6 months vacant on 3-year leases, and 8 months vacant on 5-year leases (the size of the tenant has an impact on the length of the lease with the larger tenants seeking longer-term leases)
- Rent abatement was 1 month for 1-year leases, 3 months for 3-year leases, and 6 months for 5-year leases over the life of the project
- Leasing commissions are 6.0% for all renewals and 8.5% for all new leases
- No tenant improvements will be done on 1-year leases
- Tenant improvements for 2nd generation leases start at $10 increasing to $20 in 2017 for 3-year new leases and start at $6 increasing to $15 in 2017 for 3-year renewals; Tenant improvements for 2nd generation leases start at $15 increasing to $30 in 2017 for 5-year new leases and start at $12 increasing to $21 in 2017 for 5-year renewals
- There is a 5% general vacancy on the scheduled base rental revenue
- The base year was used as the expense stop in all future leases as vacant space filled and leases rolled
- The expenses grew 2-3% on an annual basis based on the CPI and inflation rate

Document comparison by Workshare Professional on Tuesday, April 19, 2011 2:51:03 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://PHOENIX/2784182/1 |
| Description | PHOENIX-#2784182-v1-RCC_South--assumptions_for_projections |
| Document 2 ID | PowerDocs://PHOENIX/2784182/3 |
| Description | PHOENIX-#2784182-v3-RCC_South--assumptions_for_projections |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 4 |
| Deletions | 2 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 6 |

| | Tenant Name Type & Suite Number Lease Dates & Term | Floor SqFt Bldg Share | Rate & Amount per Year per Month | Changes on | Changes to | Months to Abate | Description of Operating Expense Reimbursements | Imprvmnts Rate Amount | Commssns Rate Amount | Assumption about subsequent terms for this tenant |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | UMB Office, Suite: 100 Apr-2007 to Jul-2014 88 Months | 5,082 3.02% | $32.50 $165,165 $2.71 $13,764 | Aug-2008 Aug-2009 Aug-2010 Aug-2011 Aug-2012 Aug-2013 | $33.00 $33.50 $34.00 $34.50 $35.00 $35.50 | 1-4 | Gross: Pays the increases over an expense stop of $9.00 | • | • | Market See assumption: 5 Year |
| 2 | Great American Title Office, Suite: 110 Apr-2009 to Sep-2014 66 Months | 3,134 1.85% | $25.50 $33,051 $2.21 $6,921 | Jul-2010 Aug-2010 Aug-2011 Sep-2011 Sep-2012 Oct-2012 Oct-2013 | $0.00 $27.00 $0.00 $28.00 $0.00 $28.50 $29.00 | 1-3 | Gross: Pays the increases over an expense stop of $9.50 | • | • | Market See assumption: 3 Year |
| 3 | Dow Wealth Office, Suite: 115 Jan-2007 to Apr-2012 64 Months | 2,176 1.29% | $32.00 $69,632 $2.67 $5,803 | May-2008 May-2009 May-2010 May-2011 | $32.50 $33.00 $33.50 $34.00 | 1-4 | Gross: Pays the increases over an expense stop of $9.00 | • | • | Market See assumption: 3 Year |
| 4 | Security Title Office, Suite: 120 Jan-2010 to Dec-2012 36 Months | 2,134 1.27% | $23.00 $49,082 $1.92 $4,090 | Jan-2011 Jan-2012 | $23.50 $24.00 | – | Gross: Pays the increases over an expense stop of $9.50 | • | • | Market See assumption: 3 Year |
| 5 | Vacant Office, Suite: 125 Feb-2012 to Feb-2013 13 Months | 1,883 1.12% | $20.00 $37,660 $1.67 $3,138 | • | • | 1 | Gross: Pays the increase over a base year ending Dec-2012: $9.43. | • | $1.70 8.50% $3,201 | Market See assumption: 1 Year |
| 6 | Psychiatric & Psychol Office, Suite: 130 Aug-2009 to Nov-2014 64 Months | 1,561 0.93% | $22.00 $34,342 $1.83 $2,862 | Nov-2010 Nov-2011 Nov-2012 Nov-2013 | $22.50 $23.00 $24.00 $25.00 | 1-4 | Gross: Pays the increases over an expense stop of $9.32 | • | • | Market See assumption: 3 Year |
| 7 | Vacant Office, Suite: 135 Nov-2012 to Nov-2013 13 Months | 1,631 0.97% | $20.00 $32,620 $1.67 $2,718 | • | • | 1 | Gross: Pays the increases over a base year ending Dec-2012: $9.43. | • | $1.70 8.50% $2,773 | Market See assumption: 1 Year |
| 8 | Vacant Office, Suite: 140 Mar-2012 to May-2015 39 Months | 3,252 1.93% | $20.00 $65,040 $1.67 $5,420 | Jun-2013 Jun-2014 | $20.50 $21.00 | 1-3 | Gross: Pays the increases over a base year ending Dec-2012: $9.43. | • | $5.23 8.50% $17,000 | Market See assumption: 3 Year |
| 9 | Lending Specialists Office, Suite: 145 Apr-2009 to Jul-2012 40 Months | 2,184 1.30% | $20.53 $45,059 $1.72 $3,755 | Jun-2010 Sep-2010 Aug-2011 | $0.00 $22.00 $23.00 | 1-2 | Gross: Pays the increases over an expense stop of $9.32 | • | – | Market See assumption: 3 Year |
| 10 | United Automobile Ins Office, Suite: 150 May-2007 to Jul-2012 63 Months | 4,449 2.65% | $30.00 $133,470 $2.50 $11,123 | Aug-2008 Aug-2009 Aug-2010 Aug-2011 | $30.50 $31.00 $31.50 $32.50 | 1-3 | Gross: Pays the increases over a base year ending Dec-2011: $9.18. | • | • | Market See assumption: 5 Year |
| 11 | Lomadsien Wealth Mgmt Office, Suite: 155 Jun-2009 to Sep-2012 40 Months | 1,730 1.03% | $21.00 $36,330 $1.75 $3,028 | Aug-2010 Sep-2010 Sep-2011 Oct-2011 | $0.00 $23.00 $11.50 $23.50 | 1-2 | Gross: Pays the increase over an expense stop of $9.32 | • | • | Market See assumption: 3 Year |
| 12 | Desert Gold Exchange Office, Suite: 160 Oct-2009 to Dec-2012 39 Months | 1,767 1.05% | $21.00 $37,107 $1.75 $3,092 | Jan-2011 Jan-2012 | $21.50 $22.00 | 1-3 | Gross: Pays the increases over a base year ending Dec-2011: $9.18. | • | • | Market See assumption: 3 Year |

| # | Tenant / Suite / Lease Term | Area / % | Rent | Step Date | Step Rate | Opt | Notes | | | Market |
|---|---|---|---|---|---|---|---|---|---|---|
| 13 | Spinetx<br>Office, Suite: 185<br>Sep-2009 to Feb-2014<br>54 Months | 6,605<br>3.93% | $12.50<br>$82,563<br>$1.04<br>$6,880 | Sep-2010<br>Mar-2011<br>Apr-2011<br>Mar-2012<br>Apr-2012<br>Mar-2013<br>Apr-2013 | $22.50<br>$0.00<br>$22.50<br>$0.00<br>$31.50<br>$0.00<br>$32.00 | - | Gross: Pays the increases over an expense stop of $8.50 | | | Market<br>See assumption<br>5 Year |
| 14 | The PM Group<br>Office, Suite: 170<br>Feb-2009 to Apr-2014<br>63 Months | 2,119<br>1.26% | $28.00<br>$59,332<br>$2.33<br>$4,944 | May-2010<br>May-2011<br>May-2012<br>May-2013 | $28.50<br>$29.50<br>$30.00<br>$30.50 | 1-3 | Gross: Pays the increases over an expense stop of $8.32 | | | Market<br>See assumption<br>3 Year |
| 15 | Naturally Chiropracti<br>Office, Suite: 175<br>Jan-2010 to Jun-2012<br>30 Months | 1,886<br>1.12% | $15.00<br>$28,290<br>$1.25<br>$2,358 | Jan-2011<br>Jan-2012 | $18.50<br>$19.00 | 1 | Gross: Pays the increases over an expense stop of $8.50 | | | Market<br>See assumption<br>3 Year |
| 16 | United Automobile<br>Office, Suite: 180<br>Apr-2010 to Sep-2012<br>30 Months | -<br>4,633<br>2.76% | $23.50<br>$108,876<br>$1.96<br>$9,073 | Oct-2010<br>Oct-2011 | $24.00<br>$24.50 | - | Gross: Pays the increases over a base year ending Dec-2011: $9.16. | | | Market<br>See assumption<br>5 Year |
| 17 | Vacant<br>Office, Suite: 185<br>Sep-2012 to Nov-2015<br>39 Months | 1,886<br>1.12% | $20.00<br>$37,720<br>$1.67<br>$3,143 | Dec-2013<br>Dec-2014 | $20.50<br>$21.00 | 1-3 | Gross: Pays the increases over a base year ending Dec-2012: $9.43. | - | $5.23<br>8.50%<br>$9,859 | Market<br>See assumption<br>5 Year |
| 18 | Vacant<br>Office, Suite: 190<br>Jul-2012 to Dec-2017<br>66 Months | 4,646<br>2.70% | $20.00<br>$90,900<br>$1.67<br>$7,575 | Jan-2014<br>Jan-2015<br>Jan-2016<br>Jan-2017 | $20.50<br>$21.00<br>$21.50<br>$22.00 | 1-8 | Gross: Pays the increases over a base year ending Dec-2012: $9.43. | - | $8.92<br>8.50%<br>$40,964 | Market<br>See assumption<br>5 Year |
| 19 | Remington Financial G<br>Office, Suite: 200<br>Mar-2010 to Jul-2013<br>41 Months | 5,235<br>3.11% | $22.00<br>$115,170<br>$1.83<br>$9,598 | Aug-2011<br>Aug-2012 | $22.50<br>$23.00 | 1-5 | Gross: Pays the increases over a base year ending Dec-2011: $9.16. | - | - | Market<br>See assumption<br>5 Year |
| 20 | Moss Adams<br>Office, Suite: 210<br>Mar-2008 to Apr-2014<br>74 Months | 14,928<br>8.88% | $28.00<br>$417,984<br>$2.33<br>$34,832 | May-2008<br>May-2009<br>May-2010<br>May-2011<br>May-2012<br>May-2013 | $28.50<br>$29.00<br>$29.50<br>$30.00<br>$30.50<br>$31.00 | - | Gross: Pays the increases over an expense stop of $8.00 | | | Market<br>See assumption<br>5 Year |
| 21 | Strategic Asset Conse<br>Office, Suite: 220<br>Dec-2009 to Nov-2012<br>36 Months | 1,998<br>1.19% | $25.00<br>$49,900<br>$2.08<br>$4,168 | Dec-2010<br>Dec-2011 | $25.50<br>$26.00 | - | Gross: Pays the increases over an expense stop of $8.50 | | | Market<br>See assumption<br>3 Year |
| 22 | Stephan Bull<br>Office, Suite: 230<br>Jul-2008 to Oct-2013<br>64 Months | 1,942<br>1.16% | $33.00<br>$64,086<br>$2.75<br>$5,341 | Nov-2009<br>Nov-2010<br>Nov-2011<br>Nov-2012 | $33.50<br>$34.00<br>$34.50<br>$35.00 | - | Gross: Pays the increases over an expense stop of $8.50 | | | Market<br>See assumption<br>3 Year |
| 23 | Cornelius Korte Shum<br>Office, Suite: 240<br>Jan-2010 to Oct-2013<br>46 Months | 1,886<br>1.12% | $22.33<br>$42,114<br>$1.86<br>$3,510 | Jul-2010<br>Dec-2010<br>Jun-2011<br>Nov-2011<br>Nov-2012 | $23.96<br>$26.45<br>$27.04<br>$34.50<br>$35.00 | - | Gross: Pays the increases over an expense stop of $8.50 | | | Market<br>See assumption<br>3 Year |
| 24 | Phoenix Newspapers<br>Office, Suite: 250<br>Mar-2007 to Sep-2014<br>91 Months | 17,192<br>10.23% | $27.50<br>$472,780<br>$2.29<br>$39,398 | Nov-2008<br>Nov-2009<br>Nov-2010<br>Nov-2011<br>Nov-2012<br>Nov-2013 | $28.00<br>$28.50<br>$29.00<br>$29.50<br>$30.00<br>$30.50 | 1-7 | Gross: Pays the increases over an expense stop of $8.00 | | | Market<br>See assumption<br>5 Year |
| 25 | Vacant<br>Office, Suite: 260<br>Sep-2011 to Feb-2017<br>66 Months | 3,665<br>2.18% | $23.00<br>$84,295<br>$1.92<br>$7,025 | Mar-2013<br>Mar-2014<br>Mar-2015<br>Mar-2016 | $23.50<br>$24.00<br>$24.50<br>$25.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2011: $9.16. | $50.00<br><br>$183,250 | $10.20<br>8.50%<br>$37,383 | Market<br>See assumption<br>1 Year |

| # | Tenant | SF / % | Rates | Date | Rate | Col | Notes | | | Market |
|---|--------|--------|-------|------|------|-----|-------|---|---|--------|
| 26 | Moss Adams<br>Office, Suite 260<br>Mar-2008 to Apr-2014<br>74 Months | 5,171<br>3.08% | $28.00<br>$144,788<br>$2.33<br>$12,066 | May-2008<br>May-2009<br>May-2010<br>May-2011<br>May-2012<br>May-2013 | $28.50<br>$29.00<br>$29.50<br>$30.00<br>$30.50<br>$31.00 | – | Gross: Pays the increases over an expense stop of $8.00 | • | • | Market<br>See assumption:<br>5 Year |
| 27 | Williams Financial<br>Office, Suite 290<br>Jan-2010 to May-2013<br>41 Months | 9,790<br>2.26% | $23.00<br>$87,170<br>$1.92<br>$7,264 | Apr-2011<br>Jun-2011<br>Jun-2012 | $0.00<br>$23.50<br>$24.00 | 1-3 | Gross: Pays the increases over a base year ending Dec-2011: $9.18. | • | • | Market<br>See assumption:<br>3 Year |
| 28 | MetLife<br>Office, Suite 300<br>May-2010 to Apr-2017<br>84 Months | 12,195<br>7.29% | $11.00<br>$134,145<br>$0.92<br>$11,179 | May-2011<br>May-2012<br>May-2013<br>May-2014<br>May-2015<br>May-2016 | $24.00<br>$24.25<br>$24.75<br>$25.25<br>$25.75<br>$26.25 | – | Gross: Pays the increases over a base year ending Dec-2011: $9.18. | • | • | Market<br>See assumption:<br>5 Year |
| 29 | Countrywide Home Loan<br>Office, Suite 330<br>Jan-2008 to Dec-2013<br>72 Months | 11,644<br>6.93% | $29.00<br>$337,676<br>$2.42<br>$28,140 | Jan-2009<br>Jan-2010<br>Jan-2011<br>Jan-2012<br>Jan-2013 | $29.50<br>$30.00<br>$30.50<br>$31.00<br>$31.50 | 1-4 | Gross: Pays the increases over an expense stop of $8.50 | • | • | Market<br>See assumption:<br>5 Year |
| 30 | Dr. Shelly Friedman<br>Office, Suite 350<br>Mar-2007 to Feb-2017<br>120 Months | 5,086<br>3.01% | $31.00<br>$157,046<br>$2.58<br>$13,087 | Mar-2008<br>Mar-2009<br>Sep-2009<br>Mar-2010<br>Sep-2010<br>Mar-2011<br>Jul-2011<br>Jul-2012<br>Jul-2013<br>Jul-2014<br>Jul-2015<br>Jul-2016 | $31.50<br>$32.00<br>$18.95<br>$14.21<br>$18.00<br>$32.50<br>$33.00<br>$33.50<br>$34.00<br>$34.50<br>$35.00<br>$35.50 | 1-4 | Gross: Pays the increases over an expense stop of $8.00 | | | Market<br>See assumption:<br>5 Year |
| 31 | MetLife Prop & Casual<br>Office, Suite 355<br>Aug-2010 to Apr-2015<br>57 Months | 1,243<br>0.74% | $13.75<br>$17,091<br>$1.15<br>$1,424 | May-2011<br>May-2012<br>May-2013<br>May-2014 | $24.00<br>$24.25<br>$24.75<br>$25.25 | – | Gross: Pays the increases over a base year ending Dec-2011: $9.18. | • | • | Market<br>See assumption:<br>3 Year |
| 32 | Vacant<br>Office, Suite 360<br>Aug-2011 to Jan-2017<br>66 Months | 5,000<br>2.98% | $23.00<br>$115,000<br>$1.92<br>$9,583 | Feb-2013<br>Feb-2014<br>Feb-2015<br>Feb-2016 | $23.50<br>$24.00<br>$24.50<br>$25.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2011: $9.18. | $50.00<br>$250,000 | $10.20<br>8.50%<br>$51,000 | Market<br>See assumption:<br>5 Year |
| 33 | Vacant<br>Office, Suite 365<br>Aug-2013 to Jan-2019<br>66 Months | 3,000<br>1.79% | $25.00<br>$75,000<br>$2.08<br>$6,250 | Feb-2015<br>Feb-2016<br>Feb-2017<br>Feb-2018 | $25.50<br>$26.00<br>$26.50<br>$27.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2013: $9.59. | $50.00<br>$150,000 | $11.05<br>8.50%<br>$33,150 | Market<br>See assumption:<br>3 Year |
| 34 | Vacant<br>Office, Suite 370<br>Jan-2012 to Jun-2017<br>66 Months | 2,000<br>1.19% | $23.50<br>$47,000<br>$1.96<br>$3,917 | Jul-2013<br>Jul-2014<br>Jul-2015<br>Jul-2016 | $24.00<br>$24.50<br>$25.00<br>$25.50 | 1-6 | Gross: Pays the increases over a base year ending Dec-2012: $9.43. | $50.00<br>$100,000 | $10.41<br>8.50%<br>$20,825 | Market<br>See assumption:<br>3 Year |
| 35 | Vacant<br>Office, Suite 375<br>May-2012 to Oct-2017<br>66 Months | 2,000<br>1.19% | $24.00<br>$48,000<br>$2.00<br>$4,000 | Nov-2013<br>Nov-2014<br>Nov-2015<br>Nov-2016 | $24.50<br>$25.00<br>$25.50<br>$26.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2012: $9.43. | $50.00<br>$100,000 | $10.63<br>8.50%<br>$21,250 | Market<br>See assumption:<br>3 Year |
| 36 | Vacant<br>Office, Suite 380<br>Feb-2013 to Jan-2019<br>66 Months | 10,000<br>5.95% | $24.50<br>$245,000<br>$2.04<br>$20,417 | Aug-2014<br>Aug-2015<br>Aug-2016<br>Aug-2017 | $25.00<br>$25.50<br>$26.00<br>$26.50 | 1-6 | Gross: Pays the increases over a base year ending Dec-2013: $9.59. | $50.00<br>$500,000 | $10.64<br>8.50%<br>$106,375 | Market<br>See assumption:<br>5 Year |
| 37 | Vacant<br>Office, Suite 390<br>Feb-2011 to Jul-2015<br>66 Months | 7,457<br>4.44% | $23.00<br>$171,511<br>$1.92<br>$14,293 | Aug-2012<br>Aug-2013<br>Aug-2014<br>Aug-2015 | $23.50<br>$24.00<br>$24.50<br>$25.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2011: $9.18. | $50.00<br>$372,850 | $10.20<br>8.50%<br>$76,001 | Market<br>See assumption:<br>5 Year |

| | Tenant Name<br>Type & Suite Number<br>Lease Dates & Term | Floor<br>SqFt<br>Bldg Share | Rate & Amount<br>per Year<br>per Month | Changes<br>on | Changes<br>to | Months<br>to<br>Abate | Description of<br>Operating Expense<br>Reimbursements | Imprvmnts<br>Rate<br>Amount | Commssns<br>Rate<br>Amount | Assumption about<br>subsequent terms<br>for this tenant |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Vacant<br>Office, Suite: 100<br>Feb-2013 to Jul-2018<br>66 Months | 7,777<br>4.40% | $24.50<br>$190,537<br>$2.04<br>$15,878 | Aug-2014<br>Aug-2015<br>Aug-2016<br>Aug-2017 | $25.00<br>$25.50<br>$26.00<br>$26.50 | 1-6 | Gross: Pays the<br>increases over a<br>base year ending<br>Dec-2013: $8.18. | $50.00<br><br>$388,850 | $10.84<br>8.50%<br>$34,283 | Market<br>See assumption:<br>5 Year |
| 2 | Vacant<br>Office, Suite: 110<br>Sep-2013 to Feb-2019<br>66 Months | 7,312<br>4.14% | $25.00<br>$182,800<br>$2.08<br>$15,233 | Mar-2015<br>Mar-2016<br>Mar-2017<br>Mar-2018 | $25.50<br>$26.00<br>$26.50<br>$27.00 | 1-6 | Gross: Pays the<br>increases over a<br>base year ending<br>Dec-2013: $8.19. | $50.00<br><br>$365,600 | $11.05<br>8.50%<br>$60,788 | Market<br>See assumption:<br>5 Year |
| 3 | M&L Excellent Adventu<br>Office, Suite: 150<br>Apr-2008 to Jun-2013<br>63 Months | 5,000<br>2.83% | $29.00<br>$145,000<br>$2.42<br>$12,083 | Nov-2009<br>May-2010<br>Jul-2010<br>Oct-2010<br>Jul-2011<br>Jul-2012 | $15.10<br>$19.00<br>$9.80<br>$30.00<br>$30.50<br>$31.00 | 1-3 | Gross: Pays the<br>increases over an<br>expense stop of<br>$8.50 | - | - | Market<br>See assumption:<br>3 Year |
| 4 | LSI<br>Office, Suite: 155<br>Jan-2009 to Jan-2019<br>121 Months | 27,124<br>15.34% | $28.25<br>$766,253<br>$2.35<br>$63,854 | Aug-2010<br>Nov-2010<br>Dec-2010<br>Jan-2011<br>May-2011<br>Jun-2011<br>Jan-2012<br>Jan-2013<br>Jan-2014<br>Jan-2015<br>Jan-2016<br>Jan-2017 | $13.18<br>$12.94<br>$13.31<br>$13.56<br>$21.09<br>$28.75<br>$29.25<br>$29.75<br>$30.25<br>$30.75<br>$31.25<br>$31.75 | 1-12 | Gross: Pays the<br>increases over an<br>expense stop of<br>$9.00 | - | - | Market<br>See assumption:<br>5 Year |
| 5 | LSI<br>Office, Suite: 166<br>Nov-2010 to Jan-2019<br>99 Months | 7,146<br>4.04% | $28.25<br>$201,875<br>$2.35<br>$16,823 | Nov-2010<br>Dec-2010<br>Jan-2011<br>May-2011<br>Jun-2011<br>Jan-2012<br>Jan-2013<br>Jan-2014<br>Jan-2015<br>Jan-2016<br>Jan-2017 | $12.94<br>$13.31<br>$13.56<br>$21.09<br>$28.75<br>$29.25<br>$29.75<br>$30.25<br>$30.75<br>$31.25<br>$31.75 | - | Gross: Pays the<br>increases over an<br>expense stop of<br>$9.00 | - | - | Market<br>See assumption:<br>3 Year |
| 6 | Vacant<br>Office, Suite: 170<br>Dec-2011 to May-2017<br>66 Months | 1,342<br>0.76% | $23.00<br>$30,866<br>$1.92<br>$2,572 | Jun-2013<br>Jun-2014<br>Jun-2015<br>Jun-2016 | $23.50<br>$24.00<br>$24.50<br>$25.00 | 1-6 | Gross: Pays the<br>increases over a<br>base year ending<br>Dec-2011: $7.47. | $50.00<br><br>$67,100 | $10.20<br>8.50%<br>$13,656 | Market<br>See assumption:<br>1 Year |
| 7 | Nova<br>Office, Suite: 200<br>Feb-2010 to Apr-2015<br>63 Months | 7,582<br>4.29% | $26.00<br>$197,132<br>$2.17<br>$16,428 | May-2011<br>May-2012<br>May-2013<br>May-2014 | $26.50<br>$27.00<br>$27.50<br>$28.00 | 1-3 | Gross: Pays the<br>increases over a<br>base year ending<br>Dec-2011: $7.47. | - | - | Market<br>See assumption:<br>5 Year |

| # | Tenant / Use / Term | SqFt / % | Rent ($/SF, Annual, Monthly rate, Monthly $) | Rent Steps | Options | Lease Terms | Reimbursement | Assumption |
|---|---|---|---|---|---|---|---|---|
| 8 | Vacant<br>Office<br>May-2013 to Oct-2018<br>66 Months | 15,682<br>8.87% | $24.50<br>$384,209<br>$2.04<br>$32,017 | Nov-2014 $25.00<br>Nov-2015 $25.50<br>Nov-2016 $26.00<br>Nov-2017 $26.50 | 1-6 | Gross: Pays the increases over a base year ending Dec-2013: $8.18. | $50.00 $10.84<br>8.50%<br>$784,100 $169,954 | Market<br>See assumption:<br>5 Year |
| 9 | Vacant<br>Office<br>Mar-2011 to Aug-2016<br>66 Months | 2,500<br>1.41% | $23.00<br>$57,500<br>$1.92<br>$4,792 | Sep-2012 $23.50<br>Sep-2013 $24.00<br>Sep-2014 $24.50<br>Sep-2015 $25.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2011: $7.47. | $50.00 $10.20<br>8.50%<br>$125,000 $25,500 | Market<br>See assumption:<br>1 Year |
| 10 | Vacant<br>Office<br>Sep-2011 to Feb-2017<br>66 Months | 2,500<br>1.41% | $23.00<br>$57,500<br>$1.92<br>$4,792 | Mar-2013 $23.50<br>Mar-2014 $24.00<br>Mar-2015 $24.50<br>Mar-2016 $25.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2011: $7.47. | $50.00 $10.20<br>8.50%<br>$125,000 $25,500 | Market<br>See assumption:<br>1 Year |
| 11 | Vacant<br>Office<br>Jul-2011 to Dec-2016<br>66 Months | 4,500<br>2.54% | $23.00<br>$103,500<br>$1.92<br>$8,625 | Jan-2013 $23.50<br>Jan-2014 $24.00<br>Jan-2015 $24.50<br>Jan-2016 $25.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2011: $7.47. | $50.00 $10.20<br>8.50%<br>$225,000 $45,900 | Market<br>See assumption:<br>3 Year |
| 12 | Vacant<br>Office<br>May-2011 to Oct-2016<br>66 Months | 4,500<br>2.54% | $23.00<br>$103,500<br>$1.92<br>$8,625 | Nov-2012 $23.50<br>Nov-2013 $24.00<br>Nov-2014 $24.50<br>Nov-2015 $25.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2011: $7.47. | $50.00 $10.20<br>8.50%<br>$225,000 $45,900 | Market<br>See assumption:<br>3 Year |
| 13 | Vacant<br>Office<br>Nov-2011 to Apr-2017<br>66 Months | 7,500<br>4.24% | $23.00<br>$172,500<br>$1.92<br>$14,375 | May-2013 $23.50<br>May-2014 $24.00<br>May-2015 $24.50<br>May-2016 $25.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2011: $7.47. | $50.00 $10.20<br>8.50%<br>$375,000 $76,500 | Market<br>See assumption:<br>5 Year |
| 14 | Vacant<br>Office<br>Nov-2012 to Apr-2018<br>66 Months | 7,500<br>4.24% | $24.00<br>$180,000<br>$2.00<br>$15,000 | May-2014 $24.50<br>May-2015 $25.00<br>May-2016 $25.50<br>May-2017 $26.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2012: $7.87. | $50.00 $10.63<br>8.50%<br>$375,000 $79,688 | Market<br>See assumption:<br>3 Year |
| 15 | Vacant<br>Office<br>Jan-2012 to Jun-2017<br>66 Months | 2,000<br>1.13% | $23.50<br>$47,000<br>$1.96<br>$3,917 | Jul-2013 $24.00<br>Jul-2014 $24.50<br>Jul-2015 $25.00<br>Jul-2016 $25.50 | 1-6 | Gross: Pays the increases over a base year ending Dec-2012: $7.87. | $50.00 $10.41<br>8.50%<br>$100,000 $20,825 | Market<br>See assumption:<br>3 Year |
| 16 | Vacant<br>Office<br>Jul-2012 to Dec-2017<br>66 Months | 2,000<br>1.13% | $24.00<br>$48,000<br>$2.00<br>$4,000 | Jan-2014 $24.50<br>Jan-2015 $25.00<br>Jan-2016 $25.50<br>Jan-2017 $26.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2012: $7.87. | $50.00 $10.63<br>8.50%<br>$100,000 $21,250 | Market<br>See assumption:<br>3 Year |
| 17 | Vacant<br>Office<br>Sep-2012 to Feb-2018<br>66 Months | 2,000<br>1.13% | $24.00<br>$48,000<br>$2.00<br>$4,000 | Mar-2014 $24.50<br>Mar-2015 $25.00<br>Mar-2016 $25.50<br>Mar-2017 $26.00 | 1-6 | Gross: Pays the increases over a base year ending Dec-2012: $7.87. | $50.00 $10.63<br>8.50%<br>$100,000 $21,250 | Market<br>See assumption:<br>1 Year |
| 18 | Hypercom<br>Office, Suite: 300<br>Jul-2008 to Mar-2019<br>129 Months | 48,650<br>27.51% | $27.50<br>$1,337,875<br>$2.29<br>$111,490 | May-2010 $28.00<br>May-2011 $28.50<br>May-2012 $29.00<br>May-2013 $29.50<br>May-2014 $30.00<br>May-2015 $30.50<br>May-2016 $31.00<br>May-2017 $31.50<br>May-2018 $32.00 | 1-9 | Gross: Pays the increases over an expense stop of $9.00 | | Market<br>See assumption:<br>5 Year |
| 19 | Vacant<br>Office, Suite: 305<br>May-2012 to Oct-2017<br>66 Months | 14,208<br>8.04% | $23.50<br>$333,888<br>$1.96<br>$27,824 | Nov-2013 $24.00<br>Nov-2014 $24.50<br>Nov-2015 $25.00<br>Nov-2016 $25.50 | 1-6 | Gross: Pays the increases over a base year ending Dec-2012: $7.87. | $50.00 $10.41<br>8.50%<br>$710,400 $147,941 | Market<br>See assumption:<br>5 Year |

Raintree Corp Center III
Occupancy Rates - Occupied Office

| For the Years Ending | Year 1 Dec-2011 | Year 2 Dec-2012 | Year 3 Dec-2013 | Year 4 Dec-2014 | Year 5 Dec-2015 | Year 6 Dec-2016 | Year 7 Dec-2017 | Year 8 Dec-2018 |
|---|---|---|---|---|---|---|---|---|
| **Square Feet Occupied** | | | | | | | | |
| January | 121,748 | 139,870 | 144,537 | 152,595 | 164,875 | 164,295 | 164,277 | 163,522 |
| February | 129,205 | 141,753 | 159,170 | 156,423 | 168,067 | 162,366 | 163,067 | 163,522 |
| March | 129,205 | 145,005 | 159,283 | 149,818 | 168,067 | 165,883 | 152,705 | 164,933 |
| April | 129,205 | 145,005 | 165,067 | 159,579 | 168,067 | 166,337 | 163,001 | 159,637 |
| May | 129,205 | 144,829 | 165,067 | 139,244 | 164,941 | 166,337 | 152,044 | 166,506 |
| June | 129,205 | 144,829 | 161,277 | 145,849 | 163,572 | 164,188 | 152,044 | 162,057 |
| July | 129,205 | 147,488 | 161,277 | 147,968 | 164,816 | 162,170 | 164,184 | 163,618 |
| August | 134,205 | 163,031 | 159,042 | 162,985 | 168,067 | 156,709 | 166,067 | 151,551 |
| September | 137,870 | 144,917 | 162,832 | 162,985 | 168,067 | 160,610 | 168,067 | 153,434 |
| October | 137,870 | 140,440 | 162,832 | 142,659 | 168,067 | 168,067 | 165,948 | 166,824 |
| November | 137,870 | 144,255 | 159,004 | 147,741 | 165,891 | 168,067 | 163,948 | 163,572 |
| December | 137,870 | 146,708 | 162,608 | 149,314 | 164,005 | 164,277 | 166,067 | 164,815 |
| Average Occupied For The Year | 131,889 | 144,011 | 160,166 | 151,430 | 166,375 | 164,109 | 161,785 | 161,969 |
| Occupancy Rate | 78.5% | 85.7% | 95.3% | 90.1% | 99.0% | 97.6% | 96.3% | 96.4% |

Raintree Corp Center IV
Occupancy Rates - Occupied Office

| For the Years Ending | Year 1 Dec-2011 | Year 2 Dec-2012 | Year 3 Dec-2013 | Year 4 Dec-2014 | Year 5 Dec-2015 | Year 6 Dec-2016 | Year 7 Dec-2017 | Year 8 Dec-2018 |
|---|---|---|---|---|---|---|---|---|
| Square Feet Occupied | | | | | | | | |
| October | 95,502 | 120,344 | 146,052 | 176,823 | 176,823 | 176,823 | 167,323 | 174,823 |
| November | 95,502 | 120,344 | 153,829 | 176,823 | 176,823 | 176,823 | 167,323 | 174,823 |
| December | 98,002 | 120,344 | 153,829 | 176,823 | 176,823 | 176,823 | 174,323 | 174,823 |
| January | 98,002 | 120,344 | 153,829 | 176,823 | 176,823 | 176,823 | 176,823 | 174,323 |
| February | 102,502 | 134,552 | 169,511 | 176,823 | 169,241 | 176,823 | 169,323 | 169,323 |
| March | 102,502 | 134,552 | 169,511 | 176,823 | 169,241 | 176,823 | 167,981 | 169,323 |
| April | 107,002 | 136,552 | 164,511 | 176,823 | 176,823 | 176,823 | 174,823 | 175,481 |
| May | 107,002 | 136,552 | 164,511 | 176,823 | 176,823 | 176,823 | 174,823 | 169,046 |
| June | 109,502 | 136,552 | 171,823 | 176,823 | 176,823 | 174,323 | 176,823 | 169,046 |
| July | 109,502 | 136,552 | 176,823 | 176,823 | 176,823 | 176,823 | 174,323 | 176,823 |
| August | 117,002 | 146,052 | 176,823 | 176,823 | 176,823 | 172,323 | 162,616 | 158,641 |
| September | 118,344 | 146,052 | 176,823 | 176,823 | 176,823 | 172,323 | 162,616 | 161,141 |
| Average Occupied For The Year | 105,031 | 132,733 | 164,828 | 176,823 | 175,559 | 175,865 | 170,760 | 170,635 |
| Occupancy Rate | 59.4% | 75.1% | 93.2% | 100.0% | 99.3% | 99.5% | 96.6% | 96.5% |

| | | Year 1 Dec-2011 | Year 2 Dec-2012 | Year 3 Dec-2013 | Year 4 Dec-2014 | Year 5 Dec-2015 | Year 6 Dec-2016 | Year 7 Dec-2017 | Year 8 Dec-2018 |
|---|---|---|---|---|---|---|---|---|---|
| **Renewal Probability** | | 50.00% | 50.00% | 50.00% | 60.00% | 75.00% | 75.00% | 75.00% | 75.00% |
| **Market Rent $PSF** | | | | | | | | | |
| 1-Year Lease New and Renewal | | 21.00 | 22.05 | 23.15 | 24.31 | 25.53 | 26.80 | 28.14 | 29.55 |
| 3-Year Lease New and Renewal | | 21.00 | 22.05 | 23.15 | 24.31 | 25.53 | 26.80 | 28.14 | 29.55 |
| 5-Year Lease New and Renewal | | 21.00 | 22.05 | 23.15 | 24.31 | 25.53 | 26.80 | 28.14 | 29.55 |
| **Months Vacant** | | | | | | | | | |
| 1-Year Lease | New: | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 |
| | Renewal: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Result: | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 3-Year Lease | New: | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 |
| | Renewal: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Result: | 3 | 3 | 3 | 2 | 2 | 2 | 2 | 2 |
| 5-Year Lease | New: | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 |
| | Renewal: | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Result: | 4 | 4 | 4 | 3 | 3 | 2 | 2 | 2 |
| **Tenant Improvements $PSF** | | | | | | | | | |
| 1-Year Lease | New: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Renewal: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Result: | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 3-Year Lease | New: | 10.00 | 10.00 | 15.00 | 15.00 | 20.00 | 20.00 | 20.00 | 20.00 |
| | Renewal: | 6.00 | 6.00 | 10.00 | 10.00 | 15.00 | 15.00 | 15.00 | 15.00 |
| | Result: | 8.00 | 8.00 | 12.50 | 12.00 | 18.25 | 16.25 | 16.25 | 16.25 |
| 5-Year Lease | New: | 15.00 | 15.00 | 18.00 | 18.00 | 24.00 | 24.00 | 30.00 | 30.00 |
| | Renewal: | 12.00 | 12.00 | 14.00 | 14.00 | 18.00 | 18.00 | 21.00 | 21.00 |
| | Result: | 13.50 | 13.50 | 16.00 | 16.00 | 19.50 | 19.50 | 23.25 | 23.25 |
| **Leasing Commissions** | New: | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% |
| | Renewal: | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% |
| | Result: | 7.25% | 7.25% | 7.25% | 7.25% | 7.00% | 6.63% | 6.63% | 6.63% |
| **Rent Abatements** | | | | | | | | | |
| 1-Year Lease New and Renewal | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| 3-Year Lease New and Renewal | | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 |
| 5-Year Lease New and Renewal | | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 |
| **Reimbursements** | | Base Yr | Base Yr | Base Yr | Base Yr | Base Yr | Base Yr | Base Yr | Base Yr |