**Quarles & Brady** LLP
Firm State Bar No. 00443101
One South Church Avenue, Suite 1700
Tucson, AZ 85701-1621
TELEPHONE 520.770.8700
FACSIMILE 520.770.2222
SUSAN.BOSWELL@QUARLES.COM

Susan G. Boswell (AZ Bar #004791)

Attorneys for SFI Belmont LLC, successor-in-interest to iStar FM Loans LLC

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 2:10-bk-23475-SSC |
| RCC SOUTH, LLC, | **OBJECTION TO CONFIRMATION OF DEBTOR'S "THIRD AMENDED PLAN OF REORGANIZATION" [DKT. NO. 155]** |
| Debtor. | |

      SFI Belmont LLC ("Belmont"), successor-in-interest to iStar FM Loans LLC ("iStar"), the pre-petition senior-secured lender to RCC South, LLC, the debtor (the "Debtor") in the above-captioned Chapter 11 case (the "Bankruptcy Case"), submits this objection to confirmation of the Debtor's "Third Amended Plan of Reorganization" [Dkt. No. 155] (the "Plan"). Based on the Plan and the information contained in the "Third Amended Disclosure Statement Relating to Plan of Reorganization" [Dkt. No. 156] (the "Disclosure Statement"), the Plan is patently unconfirmable because it violates almost every provision of 11 U.S.C. § 1129.[1] Most glaringly,

---

[1] The objections set forth herein are based upon the information now known to Belmont. Discovery in this matter is not yet complete. Therefore, Belmont expressly reserves the right to supplement this Objection, to urge other and new arguments or to elaborate upon the arguments contained herein, as additional facts become known to Belmont.

and as detailed herein, the Plan: (i) lacks any impaired accepting class; (ii) is not proposed in good faith; (iii) is not feasible, (iv) violates the absolute priority rule because, among other things, the auction procedure does not comply with the procedures articulated by the United States Supreme Court in *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) or satisfy the new value corollary to the absolute priority rule; and (v) is not "fair and equitable" to Belmont by failing to pay it the present value of its secured claim. The Debtor has not and cannot carry its burden of proving that the Plan complies with the confirmation requirements. Therefore, Belmont respectfully requests that this Court deny confirmation of the Debtor's Plan, and grant Belmont relief from the automatic stay pursuant to Belmont's pending motion for relief.

## I.    FACTUAL AND PROCEDURAL BACKGROUND.

The Court is aware of the background of this case, and therefore only a brief summary of facts is appropriate. The Debtor is the owner of certain real property and improvements located at 8800, 8840, and 8888 East Rain Tree Drive, Scottsdale, Arizona (the real property, together with the building, structures, improvements, furniture, fixtures, equipment and personal property pertaining to or affixed thereon, the "Property"), and the Debtor's Bankruptcy Case is a single-asset real estate case. The Debtor asserts that the Property has a value of approximately $47.2 million. According to its filed schedules, the Debtor's remaining assets consist primarily of furniture and equipment, which allegedly have a book value of $1,786,894.41. [Dkt. No. 32, Sch. B.] In the Disclosure Statement, however, the Debtor asserts the personal property's value is negligible. [Dkt. No. 156 at 7.] Therefore, based on its $76,877,199 claim, Belmont holds a first-position secured claim valued at least between $47 and $48,786,894 million on all the Debtor's Property, and an unsecured claim of almost $30 million.

Belmont (or its predecessor, iStar) has filed a "Motion to Terminate Exclusivity [Dkt. No. 83] (the "Termination Motion") and also "SFI Belmont LLC's Motion for Relief from the Automatic Stay and Other Related Relief" [Dkt. No. 150], both of which are herein incorporated

-2-

by this reference. The Court indicated, in denying Belmont's Termination Motion, that the Debtor would have one chance at confirming a plan in its single-asset real estate case, and that if it failed to do so, Belmont would be granted relief from the automatic stay.

The Plan the Debtor subsequently filed (which is the fourth plan the Debtor has presented) relies upon a fatally flawed and unfair auction procedure and a grossly gerrymandered attempt at claim impairment designed purely to ensure the Debtor will realize an affirmative vote from an impaired accepting class - even if that claimant and class holds a claim of only a couple thousand dollars - in order to disenfranchise Belmont and its $76 million claim. The Plan is nothing more than an attempt by current equity holders to retain ownership of this Property by limiting the marketing of the new equity (including recognition of Belmont's right to credit bid), discharging tens of millions of dollars of debt and making the secured creditor with its significantly reduced claim take all the risk during the plan period. This is the very apex of bad faith. Leaving these problems aside, however, the Debtor has not succeeded in legitimately impairing its impaired classes, leaving it with a failure to satisfy 11 U.S.C. § 1129(a)(10). Moreover, the Plan fails to account for the risk it imposes on Belmont (which is slated to receive only $7 million in payments on its secured claim under the Plan over the term of the Plan and which must wait seven years for the $40 million balloon payment the Debtor speculates it will receive upon a sale or refinancing to satisfy Belmont's secured claim). Thus, not only is the Plan not "fair and equitable," and does not satisfy the requirements of 11 U.S.C. § 1129(a) in general, but it is also not feasible. The Debtor's own projections show staggering shortfalls in cash flow in four of the seven years of the Plan, and when the proposed interest rate is adjusted upward to account for the extreme risks to Belmont, the feasibility problem will only worsen.

Therefore, based upon the grossly unconfirmable Plan the Debtor has filed, Belmont believes that Plan confirmation should be denied on legal issues alone, without the burdensome

-3-

Quarles & Brady LLP

(for all parties involved, in addition to the Court) and expensive presentation of evidence, as further explained herein.[2]

## II.   **LEGAL AUTHORITY.**

11 U.S.C. §§ 1129(a) and (b) set forth the minimum requirements the Debtor's Plan must meet to be confirmed. The Court lacks jurisdiction to confirm a plan that does not comply with such requirements; indeed, the Court has an affirmative duty to ensure all confirmation requirements are met. *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997). The burden of proving that the plan complies with 11 U.S.C. § 1129 falls squarely on the Debtor. *In re Acequia, Inc.*, 787 F.2d 1352, 1358 (9th Cir. 1986) (noting that the plan proponent bears the burden of proving confirmability). In this case, the Debtor has not carried its burden of proof, and the Plan is not confirmable.

A.   The Plan Cannot Be Confirmed Because It Violates 11 U.S.C. § 1129(a)(1).

A Chapter 11 plan cannot be confirmed unless it complies with all provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1); *In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995); *In re Beyond.com Corp.*, 289 B.R. 138, 143-144 (Bankr. N.D. Cal. 2003) (denying confirmation of a Chapter 11 plan when its implementation required violating, among others, 11 U.S.C. §§ 327, 330, and 554). In this case, the Plan violates a plenitude of Bankruptcy Code provisions, including 11 U.S.C. §§ 362, 363, 364, 365, 506, 553, 1122, and 1123, among others.

The Plan's treatment of numerous creditors, including Laser Spine Surgery Center of Arizona, LLC ("Laser Spine") and all of the Debtor's tenants (as so-called "Security Deposit Creditors"), violates 11 U.S.C. § 1122 by depriving these creditors of their non-voting, administrative status, and classifying them separately from one another.

---

[2] Belmont expressly reserves its right to present evidence at a full evidentiary confirmation hearing, in the event the Court determines presentation of evidence to be necessary.

-4-

The Plan impermissibly permits tenant Laser Spine to vote a claim (alleged by the Debtor, not by Laser Spine) based on setoff of rent for un-reimbursed tenant improvements—a claim that has already been paid by the Debtor by allowing Laser Spine to setoff its post-petition rent without any Court or Belmont approval. Belmont recently became aware of an amendment to the lease entered into between the Debtor and Laser Spine post-petition, which was neither disclosed to nor approved by the Court. Although the Debtor never signed the document memorializing the amendment, it appears to have fully performed its obligations under the amendment. A copy of the amendment is attached hereto as Exhibit "A." Pursuant to this agreement, the Debtor agreed that (i) Laser Spine would offset any unreimbursed tenant improvements against any rents owed by Laser Spine from August 1, 2010 to May 31, 2011, and (ii) Laser Spine would receive interest at an annual rate of 18% on the outstanding unreimbursed tenant improvement costs and expenses. As such, leaving aside that the agreement was neither disclosed to or approved by the Court in contravention of the Bankruptcy Code, to the extent Laser Spine has setoff the amount owed to it, it does not have a claim.

Moreover, 11 U.S.C. § 363 requires a debtor-in-possession to seek court approval for transactions, including entry into leases, that are "outside the ordinary course" of the debtor's business. *See* 11 U.S.C. § 363(b)-(d). Similarly, under 11 U.S.C. § 364, a debtor may not enter into financing transactions outside its ordinary course of business without court approval. *See* 11 U.S.C. § 364(a)-(b). Although the Bankruptcy Code does not define the term "ordinary course of business," the Ninth Circuit has determined that a transaction which meets the "horizontal" and "vertical" dimension tests is in the ordinary course of business. *See Burlington Northern Railroad Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 704 (9th Cir. 1988).

The horizontal dimension test involves an industry-wide prospective in which debtor's business is compared to similar businesses. *In re Circle K Corp.*, 141 B.R. 694, 699 (Bankr. D. Ariz. 1992). This showing ensures neither debtor nor creditor did anything abnormal to gain an

-5-

advantage over other creditors. *Id.* A transaction can be ordinary and still occur occasionally. The transaction need not be common; it need only be ordinary. In narrowing the focus, based on the nature of debtor's business, the Court must decide whether a transaction is in the course of debtor's or some other business. *In re Dant & Russell, Inc.*, 853 F.2d at 704.

The "vertical dimension" or "creditor's expectation" test examines the transaction from the viewpoint of a hypothetical creditor. *In re Blumer*, 95 B.R. 143, 147-148 (9th Cir. B.A.P. 1988). In utilizing this vertical dimension test, courts look to the nature of the debtor's pre-petition business as compared to its post-petition business. *Id.* This test inquires whether the transaction subjects a creditor to economic risks different from those accepted when the credit decision was made. *In re Circle K Corp.*, 141 B.R. at 699. As the *Dant & Russell* court explained:

> The touchstone of "ordinariness" is ... the parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing, because their objections to such transactions are likely to relate to the bankrupt's Chapter 11 status, not the particular transactions themselves.

*In re Dant & Russell*, 853 F.2d at 705.

The unusual leasing arrangement with Laser Spine is not "ordinary course" under either the horizontal or the vertical tests for "ordinariness." Although the owner/operator of an office building entering into a lease is typically an ordinary course transaction, this unusual arrangement with respect to free rent effectively financing the tenant improvements pushes the transaction into one which requires court approval under 11 U.S.C. §§ 363 or 364, or both. The arrangement fails the horizontal dimension test because it is not "ordinary" from an industry-wide prospective in which debtor's business is compared to similar businesses. *See In re Circle K Corp.*, 141 B.R. 694, 699 (Bankr. D. Ariz. 1992). Moreover, leases and rents are part of Belmont's collateral, and Belmont has not consented to the transaction. It therefore fails the vertical dimension test as well because it is not the type of transaction that falls within Belmont's "reasonable expectations of

QB\138887.00002\13339449.5

Quarles & Brady LLP

what transactions the debtor-in-possession is likely to enter in the course of its business." *See In re Dant & Russell, Inc.*, 853 F.2d 700, 705 (9th Cir. 1988).

Moreover the leases and the rents also constitute Belmont's cash collateral, resulting in the Debtor's violation of 11 U.S.C. § 363(a) and the cash collateral entered from the inception of the case, onward. The transaction in question uses that collateral and/or subordinates Belmont's rights in that collateral to the unusual financing arrangement that the Debtor is making for the tenant improvements. The transaction should therefore have been noticed and set for hearing; however, the Debtor instead chose to independently enter into an unusual transaction that gives Laser Spine an advantage over other creditors and that disadvantages Belmont by reducing its cash collateral without court approval.[3]

The Debtor will likely claim that it never acquiesced to Laser Spine setting off a portion of the rent; however, in the ten months since Laser Spine was setting off the amounts due it against a portion of the rent it owed, the Debtor did nothing to require Laser Spine to perform according to its lease. It was only when the matter was brought to the Court's attention by Belmont that the Debtor claimed it was "negotiating" with Laser Spine about the issue. It is also noteworthy that this situation was not disclosed by the Debtor in the Disclosure Statement and only came to light when Belmont raised the issue based upon the Debtor's monthly operating reports that showed that Laser Spine was not paying the full amount of its rent.

The Plan also violates 11 U.S.C. § 553 in relation to the Laser Spine claim because it proposes to setoff the Debtor's <u>pre-petition</u> debt to Laser Spine against the tenant's <u>post-petition</u> rent obligations. Laser Spine's claims against the Debtor arose pre-petition, when the Debtor failed to pay for their tenant improvements as it promised it would in Laser Spine's lease. Therefore, Laser Spine may only "setoff" these pre-petition debts against any rent due and owing

---

[3] While the "arrangement" with Laser Spine makes the Plan unconfirmable, the Debtor would be required to pay or make arrangements with Laser Spine to cure the default under the Laser Spine lease in any event since the Debtor is assuming the Laser Spine lease. Accordingly, Laser Spine could not be an impaired creditor.

-7-

pre-petition. *See In re Bacigalupi*, *Inc.*, 60 B.R. 442, 445 (9th Cir. B.A.P. 1986). The Debtor's setoff of pre-petition debt against post-petition debt is improper because the debts lack mutuality. *See In re Verco Indus.*, 704 F.2d 1134, 1139 (9th Cir. 1983) (interpreting 11 U.S.C. § 553(a) and holding that the right to setoff may be exercised only when the mutual debts arose pre-petition) (citing 4 *Collier on Bankruptcy* at 553-22 (15th ed.)); *In re Buckenmaier*, 127 B.R. 233, 238-39 (9th Cir. B.A.P. 1991) ("The timing element requires that both claims arose pre-petition."). And the effect of this illegal setoff is to improperly elevate Laser Spine's unsecured claim to secured status. *In re County of Orange*, 183 B.R. 609, 621 n.31 (Bankr. C.D. Cal. 1995) ("The effect of a setoff is to elevate an unsecured claim to a secured claim.") (citing 11 U.S.C. § 506(a)). And Laser Spine never obtained stay relief to complete the setoff, violating 11 U.S.C. § 362(a).

Moreover, any debt owed between Laser Spine and the Debtor arises from the same "transaction" - Laser Spine's lease. Generally, debts to be setoff must arise from *different* transactions. "The defining characteristic of setoff is that the mutual debt and claim. . . are generally those arising from different transactions." *In re Silicon Valley Telecom Exchange, LLC*, 284 B.R. 700, 708 (Bankr. N.D. Cal. 2002).[4] Therefore, Laser Spine is not a secured creditor.

This improper classification of an unsecured creditor or administrative priority creditor as a secured creditor violates 11 U.S.C. § 506 (defining secured claims). Moreover, the arrangement violates 11 U.S.C. § 365. Even if Laser Spine disgorged the amounts it had setoff to the Debtor, and thereby retained a claim, the Debtor will have to assume Laser Spine's lease in order to maintain viable operations.[5] However, to preserve Laser Spine's claim, it would have to do so

---

[4] Debts arising from the same transactions *may* be subject to the defensive doctrine of recoupment. Even if they were, however, creditors who hold recoupment claims are not considered to be secured creditors. *See* 11 U.S.C. § 506(a) (listing creditors with a right to setoff as secured creditors but not mentioning recoupment); *In re Photo Mechanical Servs., Inc.*, 179 B.R. 604, 612 (Bankr. D.Minn. 1995) ("While setoff, in effect, elevates an unsecured claim to a secured status, recoupment allows the creditor to assert that certain mutual claims extinguish one another [because recoupment] is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation." (internal quotation and citations omitted)).

[5] Indeed the Plan provides for assumption of the Laser Spine lease. [Plan at 26.]

Quarles & Brady LLP

Quarles & Brady LLP

without curing the defaults existing under Laser Spine's lease (the alleged claim arising from the Debtor's pre-petition failure to pay for the tenant improvements). *See* 11 U.S.C. § 365(b)(1)(a) (stating that a debtor-in-possession may not "assume an unexpired lease of the debtor" unless it first "cures, or provides adequate assurance that [it] will promptly cure . . . such default"). If the Laser Spine lease is assumed (which is what the Debtor intends), even if there is an agreement for Laser Spine to setoff the amount of the tenant improvements against the rent or for some other type of "cure" that does not strictly comply with 11 U.S.C. § 365(b)(1)(a), that claim does not constitute a class that can vote on the plan, much less be the impaired accepting class. The Bankruptcy Code allows creditors entitled to priority treatment to either be paid in full or agree to alternative treatment; thus, they can never constitute an impaired, voting class. *See In re Bryson Props., XVIII*, 961 F.2d 496, 505 n. 8 (4th Cir. 1992); *In re Winters*, 99 B.R. 658, 663-64 (Bankr. W.D. Pa. 1989). If the Laser Spine lease is rejected, Laser Spine will simply have a Class 5 unsecured claim together with Belmont's very large unsecured claim. The only conclusion that can be drawn from this attempt to create a claim and a class where none exist is that the Debtor is attempting to create a class for the sole purpose of trying to obtain an impaired accepting class. This violates 11 U.S.C. § 365, among a number of other Bankruptcy Code provisions, and renders the Plan unconfirmable under 11 U.S.C. § 1129(a)(1).[6]

The Plan also violates 11 U.S.C. § 1123(a)(5) because the Plan does not provide "adequate means for its implementation." *See* 11 U.S.C. § 1123(a)(5). Rather, the Plan proposes simply to continue operating in exactly the same way the Debtor has always operated, without any change in management. The Plan is merely a "visionary scheme which promise[s] creditors . . . more . . . than the debtor can possibly attain." *See In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985). The Debtor has not disclosed any facts to support that it can deliver on these promises (and indeed, has presented certain facts showing that with its current, or even its

---

[6] This conduct by the Debtor is also the height of bad faith.

-9-

projected cash flows, the Plan is merely a "visionary scheme"). [Dkt. No. 156 at Ex. "A."] For example, the Disclosure Statement reveals that the Property cannot generate sufficient cash flow to operate and pay debt service, and therefore the Plan is entirely dependent upon some $5.5 million of new equity the Debtor intends to raise. But the Debtor has provided no proof that it can or has raised the money: it has not presented any funding commitment, loan commitments, or account statements showing that the new investment has been made or is forthcoming. Therefore, the Plan provides no reasonable means for implementation in violation of 11 U.S.C. § 1123(a)(5), and therefore violates 11 U.S.C. § 1129(a)(1).

Finally, the Plan violates other requirements of 11 U.S.C. §§ 1129(b) and 363 by failing to provide that the Debtor will turn over Belmont's cash collateral to Belmont at or before Plan confirmation, as required by the Bankruptcy Code. *See In re Arden Props., Inc.*, 248 B.R. 164, 169 (Bankr. D. Ariz. 2000) (holding that a creditor's secured claim is increased in the amount of cash collateral held by the Debtor unless such cash collateral is paid over to the creditor.

The Plan also violates 11 U.S.C. § 1129(a)(1) by failing to comply with the numerous other subsections of 11 U.S.C. § 1129 that are detailed herein. Therefore, the Plan cannot not be confirmed.

B.    The Plan Cannot Be Confirmed Because It Violates 11 U.S.C. § 1129(a)(2).

A Plan may not be confirmed unless the plan proponent "complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). In this case, the record reflects that the Plan does not satisfy 11 U.S.C. § 1129(a)(2) because the proponent, the Debtor, has not complied with the provisions of 11 U.S.C. §§ 362, 363, 364, 365, and 553, among others. Specifically, based on record before the Court regarding Laser Spine, the Debtor has engaged in out-of-the-ordinary-course transactions and financing, illegal setoffs, and unauthorized use of cash collateral without court approval, among other things. Moreover, the Debtor apparently does not intend to comply with 11 U.S.C. §§ 1129(b) and 363, which require the Debtor to turn over to Belmont all cash

-10-

Quarles & Brady LLP

collateral at or prior to plan confirmation. Pursuant to the Cash Collateral Order the Debtor is required to hold certain amounts of cash collateral in segregated accounts. However, upon plan confirmation that cash collateral must be turned over to Belmont. *See Arden Props. at* 169. The Plan therefore cannot be confirmed.

      C.    <u>The Plan Cannot Be Confirmed Because It Violates 11 U.S.C. § 1129(a)(3)</u>.

A Plan may not be confirmed unless it has been "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Good faith is not defined; the inquiry turns "on the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *See In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1075 (9th Cir. 2002) (explaining that this inquiry examines "the totality of the circumstances"); *In re Kemp*, 134 B.R. 413, 415 (Bankr. E.D. Cal. 1991) (reasoning that extended repayment schedule was contrary to the Bankruptcy Code's objective of "the expeditious resolution of disputes and speedy payment to creditors") (citing *In re Hoosier Hi-Reach, Inc.*, 64 B.R. 34, 38 Bankr. S.D. Ind. 1986). A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Bankruptcy Code. *In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074 (9th Cir. 2002) citing *Ryan v. Loui ( In re Corey)*, 892 F.2d 829, 835 (9th Cir. 1989) and *In re Madison Hotel Assoc.*, 749 F.2d 410, 425 (7th Cir.1984); see also *In re Shoen*, 193 B.R. 302, 318 (Bankr. D. Ariz. 1996).

"[T]he primary purpose of Chapter 11 is to achieve a reorganization of the debtor <u>and to maximize the value of the estate</u>" for the benefit of creditors. *Id.* (internal citations omitted and emphasis added); *see also In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 119 (3d Cir. 2004) ("The Supreme Court has identified two of the basic purposes of Chapter 11 as (1) 'preserving going concerns' and (2) 'maximizing property available to satisfy creditors.'"), citing *203 N. LaSalle*, 526 U.S. at 453 and *Toibb v. Radloff,* 501 U.S. 157, 163-64, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). Therefore, a Plan is only proposed in good faith if it maximizes the value of

-11-

Quarles & Brady LLP

the Debtor's estate for creditors and otherwise complies with the Debtor's fiduciary duty to place paramount importance on the interests of its creditors.

Here, the Plan places the Debtor's and its principals' interests above those of the estate's creditors, and thereby fails the test under 11 U.S.C. § 1129(a)(3). The Plan's auction procedures are not designed to maximize the value of the estate, but rather are designed to maximize old equity's retention of, and return on, equity. Furthermore, the Plan proposes to cramdown Belmont's $76 million loan to $47 million by attempting (but failing) to impair[7] the claims (each under $3,000) of Larson Allen and Fennemore Craig in order to disenfranchise Belmont, which is a shocking abuse of the cramdown provisions. Against the backdrop of these problems, the Plan's seven-year repayment schedule that will repay only some $7 million of Belmont's $47.2 secured claim while shifting the risk of the Debtor's $40 million balloon payment to Belmont is the crowning hallmark of bad faith. The Plan the Debtor proposes is contrary to the objectives and purposes of the Bankruptcy Code, and cannot be confirmed.

> 1. The Auction Procedures Are Designed to Protect Old Equity to the Detriment of Creditors.

The bidding procedures the Debtor proposed for the equity interests in the reorganized debtor reveal that the bidding process is proposed in bad faith and aimed at assuring that the Debtor's pre-petition owners will be the successful purchasers of the equity interests rather than encouraging third-party bids.

Bidding procedures should facilitate a fair sale of a Chapter 11 debtor's assets through a process that maximizes the value of the estate. *See, e.g.*, *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re E-Z Serve*

---

[7] For the reasons discussed herein, Belmont asserts these claims are not actually impaired pursuant to 11 U.S.C. § 1124.

Quarles & Brady LLP

Quarles & Brady LLP

*Convenience Stores, Inc.,* 289 B.R. 45, 54 (Bankr. M.D.N.C. 2003) (denying approval of a sale that was not in the best interest of the estate and auction procedures that were "patently unfair and inequitable"); *In re President Casinos, Inc.,* 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (authorizing debtor to conduct asset sale but refusing to approve bid procedures that could have chilled bidder interest). This merely reflects the concept that "good faith" under the Bankruptcy Code requires a debtor to maximize the value of its estate for its creditors.

The Debtor proposed RCCH as its stalking horse bidder. Given the insider relationship of the Debtor, RCCH and CMS, the one-sided bid procedures warrant particular scrutiny. *See In re Yellowstone Mountain Club, LLC*, No. 08-61570-11, 2009 WL 982233 at *5 (Bankr. D. Mont. Feb. 18, 2009) ("The close relationship of the Debtor, Edra Blixseth and CrossHarbor requires that the Court be particularly cautious about approving any bidding procedures that would favor CrossHarbor to the detriment of the other parties in interest in this case."); *see also In re Summit Global Logistics, Inc.*, 2008 WL 819934 at *9 (Bankr. D.N.J. March 26, 2008) (insider transactions subject to "heightened scrutiny" standard); *Westship, Inc. v. Trident Shipworks, Inc.*, 247 B.R. 856, 866 (M.D. Fla. 2000) (same); *In re Copndere Corp.*, 228 B.R. 615, 632 (Bankr. S.D. Miss. 1998) (same); *In re Medical Software Solutions*, 286 B.R. 431, 445-46 (Bankr. D. Utah 2002) (same).

The Debtor's bidding procedures cannot pass muster under any standard, let alone the standard of heightened scrutiny. The Debtor is attempting to limit the universe of bidders and provides for no advertisement of the auction. In addition, the procedures contain an untenable timeline for submitting deposits and providing information to qualify as a bidder. A potential purchaser must deposit $1,000,000 in cash with the Debtor at least 25 days prior to the auction. [Plan at 19-20.] Also to be delivered to the Debtor at least 25 days prior to the auction is evidence regarding the prospective purchaser's (i) financial ability to support its bid, (ii) ability to operate the reorganized debtor, and (iii) having obtained the permits and other qualifications necessary to own the Property. [*Id.*] Yet the Debtor is required by the Plan to give only 30 days'

-13-

notice of the date of the auction, leaving approximately 5 days for any potential bidders to obtain $1,000,000 in cash, satisfy the other requirements proposed and purportedly do any due diligence required to submit a bid. [*See id*.] This timeline effectively ensures that there will be no bidders at the auction except RCCH.[8] Specifically, the Plan exempts RCCH from virtually all of the requirements that a third-party bidder must satisfy. RCCH is exempt from providing a significant cash deposit or any evidence of its financial ability to support its bid or ability to operate the reorganized debtor. [*See* Plan at 25 ("RCCH shall have the right and ability to bid at the auction.").] All that is required of RCCH is that it must place $250,000 in an escrow account - a quarter of the amount required to qualify any other bidder. [*See* Plan at 25.] Moreover, the determination regarding whether a prospective purchaser qualifies as a bidder rests with the Debtor (and its self-interested owners), subject to final court approval in case of dispute. There is no objective assurance that negotiations will be balanced or conducted with complete loyalty to creditors.

Second, through the one-sided bidding procedures, the Debtor proposes to give all equity in the reorganized company to the current owners for only $5,500,000. Although the Debtor has refused to properly market the new equity or the Property, based on the Debtor's projections (which contemplate the Property's value by December 2018 to be $74,754,067—$30,000,000 more than the current value), the proposed equity contribution of $5,500,000 is clearly insufficient. [*See* Dkt. No. 156, Ex. "A" at p. 2.] Belmont believes these projections are grossly flawed. However, assuming that the projections are correct, the contribution of $5.5 million in exchange for property that will be discharged of approximately $30 million of senior, secured debt is also insufficient. The Debtor's clear intent is to ensure that no other parties bid for the

---

[8] As discussed in more detail below, the Plan also fails to recognize Belmont's credit bid rights so that the auction procedures do not even account for Belmont's ability to credit bid at the sale.

-14-

Quarles & Brady LLP

equity in the reorganized company and retain all upside on the Property, speculating on the real estate market at the expense of Belmont and the Debtor's other creditors.

In addition, according to the Debtor's projections regarding the Property's value, all secured and unsecured claims could be repaid, along with any new equity contributed, prior to the time seven years has passed. The Plan's allowance of the Debtor's new equity interests to speculate on the Property's value while requiring that its creditors wait to be repaid is simply bad faith. Moreover, the Plan allows the Debtor to retain and use all excess cash flow over and above debt service and expenses of the Property, essentially allowing the Debtor to use Belmont's collateral to generate income for equity, rather than using excess cash flow to pay additional amounts on the unsecured claims (a distribution on which the Debtor has capped). [*See* Plan at 16-18.]

Third, it is clear that the Plan and bidding procedures were expressly designed and intended to frustrate the ability of Belmont to credit bid for the assets financed by the pre-petition loan documents (*i.e.*, the Property) by expressly limiting bidding to current creditors and interest holders of the Debtor, purportedly to avoid any potential registration or like requirements relating to the securities laws. [*See* Plan at 23.] Because the Debtor is a single-asset real estate entity, with its sole material asset consisting of the Property, the Debtor could just as easily auction the Property rather than the equity interests, which would placate any issues arising from the securities laws. (As discussed below, the Debtor has also completely failed to explain in the Plan and Disclosure Statement why there is not a valid exemption from registration of the membership interests in the reorganized entity that it intends to sell.) However, the Debtor has chosen not to truly subject the Property or the interests in the reorganized debtor to the market, although a public auction at which third-parties could bid would maximize the value of the estate in accordance with the Bankruptcy Code's mandate.

Finally, given that the Debtor is owned and controlled by RCCH, the proposed stalking horse bidder, the Debtor is clearly unable to negotiate effectively with RCCH on behalf of the

-15-

estate. The bidding procedures set forth in the Disclosure Statement and Plan, which evidence this conflict of interest, are merely a veiled attempt by the Debtor's current equity owners to ensure that no other parties bid for the equity in the reorganized company and ultimately to usurp any upside potential of the Property without paying superior creditors in full. Indeed, the Debtor does not even intend to conduct the biased auction unless forced to by the Court. [Plan at 23.] Each and every protectionist provision was designed to maximize value and minimize risk for the Debtor's equity, rather than maximize the value of the Debtor's estate, as is the minimum requirement under the Bankruptcy Code's good faith mandate.

> 2. The Debtor's Classification Scheme and Attempted Impairment of Larson Allen and Fennemore Craig are Bad Faith Attempts to Preserve Value for the Debtor's Equity Holders While Disenfranchising the Debtor's Largest Creditor.

In an effort to disenfranchise its largest creditor, Belmont, from protecting itself against the Plan's damaging provisions, the Debtor has attempted to impair the Class 2-C and 2-D secured claims of Fennemore Craig and Larson Allen in the amounts of $2,600, and $2,940, respectively. [Plan at 14-15.] As oversecured creditors,[9] both Fennemore Craig and Larson Allen have the right under the Bankruptcy Code to accrue interest and set off their claims. 11 U.S.C. §§ 506(a) and (b) and 553. Therefore, although the Debtor has attempted to impair these claims, it has failed, because it has not altered their legal rights as required for impairment by 11 U.S.C. § 1124.

Furthermore, even if one or more of these claims were to be deemed impaired, the Debtor's Plan would fail the "good faith" test for confirmation under 11 U.S.C. § 1129(a)(3). Although the Ninth Circuit has no prohibition against so-called "artificial" impairment,

---

[9] Each holds a pre-petition retainer in an amount that is more than 7 times the amount of any claim each has against the Debtor. This mechanism smacks of bad faith and appears to be a pattern for management of the Debtor. *See, e.g.,* Case No. 2:10-bk-11078-SSC, *In re RCC North, LLC*, "Amended Plan of Reorganization" [Dkt. No. 88] at 14-15.

-16-

Quarles & Brady LLP

confirmation may still be denied in such a case based on a lack of good faith under 11 U.S.C. § 1129(a)(3) when a debtor proposes some insignificant impairment to a class of creditors in an effort to force a cramdown plan of reorganization on a truly impaired creditor in an attempt to circumvent the purpose of 11 U.S.C. § 1129(a)(1). *See In re L & J Anaheim Assocs.*, 995 F.2d 940, 943 n. 2 (9th Cir. 1993) ("[A]buses on the part of a plan proponent ought not affect the application of Congress's definition of impairment. The bankruptcy court can and should address such abuses by denying confirmation on the grounds that the plan has not been proposed in good faith.") (internal punctuation omitted); *see also Matter of Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1353 (5th Cir. 1989) (remanding to bankruptcy court to determine whether artificial impairment to achieve cramdown prevented confirmation on grounds of lack of good faith under 11 U.S.C. § 1129(a)(3)).[10]

In this case, the Debtor's abuse of the impairment provisions precludes confirmation of its plan, on grounds of bad faith. It is contrary to the Bankruptcy Code's equitable principles to disenfranchise a creditor with total claims of $76 million, which stands to suffer losses (even if the Plan were to be successful on a going-forward basis, which Belmont believes it cannot be) of more than $30 million, based on an affirmative Plan vote by a $2,940 secured claimant whose position is very slightly improved by the Plan. In the context of a single-asset real estate case, "approving a plan that aims to disenfranchise the overwhelmingly largest creditor through artificial classification is simply inconsistent with the principles underlying the Bankruptcy Code." *See Boston Post Road Ltd. P'ship v. Fed. Deposit Ins. Corp. (In re Boston Post Road Ltd. P'ship)*, 21 F.3d 477, 483 (2d Cir. 1994) (cited approvingly and followed by the Ninth Circuit in *Barakat v. Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520, 1525-26 (9th Cir. 1996)). "A key

---

[10] As discussed in more detail above, the Debtor also attempted to create a class and impair the Laser Spine claim without any disclosure that the setoff that was proposed under the Plan was already occurring. Moreover, the Debtor attempted to create an impaired class when it knew that any claim of Laser Spine could not be an impaired claim under applicable provisions of the Bankruptcy Code.

-17-

Quarles & Brady LLP

premise of the Code is that creditors holding greater debt should have a comparably greater voice in reorganization." *Id*. "Chapter 11 is far better served by allowing those creditors with the largest unsecured claims to have a significant degree of input and participation in the reorganization process, since they stand to gain or lose the most from the reorganization of the debtor." *Id*. In this case, the Debtor's attempt to cramdown Belmont based on its artificial impairment of miniscule claims is the epitome of bad faith, having both a motive and result that are contrary to the Bankruptcy Code's purposes and goals. The Plan is therefore not confirmable under 11 U.S.C. § 1129(a)(3).

> D. The Plan Cannot Be Confirmed Because It Violates 11 U.S.C. § 1129(a)(5).

A plan must disclose sufficient information relating to post-confirmation management and insiders (to the extent they are individuals), and their proposed compensation; additionally, the retention of pre-petition management must be "consistent with the interests of creditors and equity holders and with public policy." 11 U.S.C. § 1129(a)(5); *see In re Beyond.com Corp.*, 289 B.R. 138, 144 (Bankr. N.D. Cal. 2003) (explaining that 11 U.S.C. § 1125(a) is "a blend of disclosure and substantive requirements," which enable the court to make "a substantive determination . . . whether post-confirmation management serves the interests of creditors . . . and is consistent with public policy") (citing 7 *Collier on Bankruptcy* ¶ 1129.03[5] (15th ed.)). The retention of pre-petition management is "inconsistent with the interests of creditors, equity security holders, and public policy if it . . . perpetuates incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor." *See id.* at 145 (denying confirmation of Chapter 11 plan when the debtor failed to disclose sufficient information regarding management and insiders).

The Debtor's proposal to retain CMS ("Cavan"), the same entity that operated the Debtor pre-petition, is contrary to the interests of creditors in violation of 11 U.S.C. § 1129(a)(5)(A). By way of example, Cavan paid itself preferential payments in the weeks prior to authorizing the

-18-

filing of the Debtor's bankruptcy in the approximate amount of $235,000, including amounts representing their own management fees from July, 2010 (the month of the Debtor's petition date) through January, 2011! [Dkt. No. 32 at 29-37; Dkt. No. 51 at 4.] These prepayments were returned only because iStar, Belmont's predecessor, refused to grant the Debtor permission to use cash collateral until they were returned. [*See* Dkt. No. 51 at 4.] In doing so, Cavan was indisputably acting in its own best interests, rather than the best interests of creditors. Presumably, Cavan is also responsible for the Debtor's unauthorized post-petition Laser Spine setoff, and the Debtor's predicament generally. Moreover, the Plan also fails to set forth the compensation that will be paid to Cavan in contravention of 11 U.S.C. § 1129(a)(5)(B). Accordingly, the Plan should not be confirmed.

E.   The Plan Cannot Be Confirmed Because It Violates 11 U.S.C. § 1129(a)(7).

A plan may not be confirmed unless it is in the best interest of creditors, a test that requires a comparison of what impaired creditors would receive under a liquidation of the debtor's assets with what they will receive under the proposed plan. 11 U.S.C. § 1129(a)(7). A debtor has the burden of proof in this respect. *See In re Ambanc,* 115 F.3d at 656 (citing *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *In re M. Long Arabians*, 103 B.R. 211 (9th Cir. B.A.P. 1989)).

Here, given the Debtor's failure to: (i) provide support for its cash flow projection and assumptions, and (ii) explain how it intends to make a massive $39.9 million balloon payment at the end of year seven, it is impossible to determine whether the Plan is in the best interests of creditors, which makes it *per se* unconfirmable. *See In re Ambanc*, 115 F.3d at 656 (remanding case to the bankruptcy court for a factual determination of whether the proposed Chapter 11 plan was in the best interest of creditors). As it stands, there is simply no way that creditors can perform a meaningful Chapter 7 liquidation analysis.

Quarles & Brady LLP

The best guess with the information given seems to be that the Plan absolutely does not satisfy the best interests of creditors test. If the Debtor was liquidated under Chapter 7, Belmont, on account of its secured claim, would immediately receive its collateral and would be able to liquidate it in a commercially reasonable and value maximizing way. Instead, under the Plan, the Debtor merely gives Belmont a hope note, with no express terms, covenants, representations, warranties, or reporting obligations, that it thinks – without any evidentiary or even anecdotal support – it can pay off in seven years. Given the lack of feasibility of such a capricious plan, particularly when the Debtor's projections reveal that immediately after confirmation the Debtor will be unable to make its proposed principal and interest payments to Belmont, Belmont's secured claim would fare better in a Chapter 7 liquidation.

Additionally, as the Plan is presented, the Debtor's proposed monthly interest payments would not adequately protect Belmont against the possibility of declining Property value nor the risk involved with the transaction's lack of feasibility (which is discussed further, below). When the interest rate is adjusted upward to account for such risk, the Plan becomes even less feasible. Accordingly, the Plan cannot be confirmed.

F.  The Plan Cannot Be Confirmed Because It Violates 11 U.S.C. § 1129(a)(10).

A plan may not be confirmed unless it receives the acceptance of at least one impaired accepting class. 11 U.S.C. § 1129(a)(10). Because the Debtor's ballot report is not yet due, it is impossible to determine whether this factor has been met. Given the Debtor's failed attempt to artificially impair a "friendly" creditor class, however, and Belmont's control of the general unsecured creditor class, it is likely that the Debtor cannot satisfy this requirement.

First, the claim of Maricopa County for real property taxes has been paid. As discussed at length above, one of the Debtor's possible impaired accepting classes, Laser Spine, does not actually have a claim against the Debtor. Additionally, as detailed in iStar FM Loans LLC's Objection to Debtor's Disclosure Statement [Dkt. No. 88], the Plan also incorrectly and

-20-

Quarles & Brady LLP

impermissibly labels other classes of creditors as "impaired," which in fact are not impaired at all. These include the claims of Fennemore Craig (Class 2-C) and Larson Allen (Class 2-D), each of whom holds a retainer in an amount in excess of such creditor's claims, entitling it to accrue interest on its claim as a matter of law, and each of whom is authorized under the Plan to setoff its claim against the retainers on the effective date of the Plan, as discussed above, and as allowed by law.

The Plan also impermissibly classifies as impaired the claims of the Debtor's current tenants for whom the Debtor is holding security deposits. Based upon the Debtor's schedules, each of the tenants for which the Debtor holds a security deposit continues to be a tenant of the Debtor. As such, any security deposit will only become due if and when the tenant vacates the premises, and then only to the extent the tenant pays its rent and leaves the premises in the agreed upon condition. *See In re Barakat*, 99 F.3d 1520. In addition, because the Debtor proposes to assume the current leases, similar to any claim that Laser Spine may have, the current tenants' claims are post-petition administrative claims entitled to priority under 11 U.S.C. § 507(a)(1), and as a result, the tenants are not impaired and not entitled to vote on the Plan. Indeed, with its buildings at approximately 54% and 75% occupancies, the Debtor can ill-afford to reject any of these leases (which would throw the Debtor's already ugly projections into a tailspin, and which would further impermissibly impair Belmont's collateral). [*See* Dkt. No. 156 at 3-4.]

Therefore, the Plan classes, and the voting status of each, may be summarized as follows:

| Class | Impaired Accepting Class?[11] | Comment |
|---|---|---|
| 1 (Administrative Claims) | No | Unimpaired - can't vote. |
| 2-A (iStar/Belmont) | No | Belmont has cast rejecting vote. |

[11] The voting status is based on Belmont's opinions and belief and is not the same as the allegations set forth in the Debtor's Disclosure Statement.

-21-

| | | |
|---|---|---|
| 2-B (Maricopa County) | No | This claim has been paid; there are no claims in this class. |
| 2-C (Fennemore Craig) | No | Though the Disclosure Statement designates this secured claim as "impaired," the claim is not impaired, because the Debtor's Plan provides interest to the holder of this secured claim (as required by the Bankruptcy Code) and preserves the secured creditor's setoff rights (again, as required by the Bankruptcy Code). *See* 11 U.S.C. §§ 506(b) and 553. Therefore, the creditor's legal rights are not altered by the Plan. *See* 11 U.S.C. § 1124. |
| 2-D (Larson Allen) | No | *See* comment above for Class 2-C. |
| 3 (Tenant Laser Spine) | No | Either: (i) this Class has no claim, because its claim has been paid in full through the setoff described *infra*, or (ii) this Class holds an administrative claim that will be cured and eliminated when the tenant's lease is assumed under the Plan. *See In re Barakat*, 99 F.3d at 1527-28 ("The obligations assumed by the debtor under the continued leases constitute post-petition administrative claims . . . Their holders are not entitled to vote on a plan of reorganization as they are entitled to be paid in full, pursuant to 11 U.S.C. § 1129(a)(9)(A)."). |
| 4 (Tenant Security Deposits) | No | This Class is not impaired. *See Id.* at 1528. |
| 5 (Unsecured Claims) | No | Rejecting Vote (class dominated by Belmont). |
| 6 (Equity Holders) | No | Vote cannot constitute impaired accepting class because the class member is an insider. *See* 11 U.S.C. § 1129(a)(10). |

The Plan therefore has no impaired accepting class, violating 11 U.S.C. §§ 1129(a)(8) and (a)(10).

G.    The Plan Cannot Be Confirmed Because It Violates 11 U.S.C. § 1129(a)(11).

A Plan may not be confirmed if it is "likely to be followed by . . . liquidation, or the need for further financial reorganization." 11 U.S.C. § 1129(a)(11); *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986); *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985)

-22-

(denying confirmation of Chapter 11 plan for, among other things, lack of feasibility; explaining that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation") (citing 5 *Collier on Bankruptcy* ¶ 1129.02[11] (15th ed.)); *In re Beyond.com Corp.*, 289 B.R. at 145-46 ("The feasibility requirement requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable."). This confirmation requirement echoes the mandate in 11 U.S.C. § 1123(a)(5) that a Plan provide adequate means of implementation.

As is evident from the Debtor's Disclosure Statement, there is no plausible scenario in which the Property will generate sufficient cash flow in order to pay Belmont's claims pursuant to the terms of the Plan. The Debtor projects that it will experience negative cash flow in years 1 through 3 of its Plan in the total amount of $5,928,162. [Dkt. No. 156, Ex. "A" at 2.] This is prior to payment of the $500,000 initial distribution on unsecured claims, which puts the Debtor $6,428,162 in the red. [*See id.*] The proposed "new value" contribution of $5,500,000 does not come close to covering the Debtor's shortfall. And the Debtor's financial situation does not improve in the later years of the Plan either. The Debtor projects positive cash flow in years 4 through 6 totaling $2,002,127 before reverting to a negative cash flow of $66,881 in year 7, the last year of the Plan. [*Id.*] Over the life of the Plan, the Debtor does not break even: rather, it is slated to lose some $4,491,916. [*See id.*]

This overall loss of $4.5 million over the life of the Plan occurs as the Debtor pays Belmont at an inadequate 6% interest rate. As will be further shown at the confirmation trial (if one is necessary), there is no plausible scenario in which the Debtor can pay Belmont's claim if an appropriate interest rate is applied. Rather, the Debtor's losses will only mount.

Moreover, the Debtor's Disclosure Statement includes projections that over-estimate revenue, rendering all its projections for its performance under the Plan inaccurate. Indeed, more than half of the Debtor's tenants are currently under some form of rent relief; many have been for

-23-

several years now.  It is likely that the number of tenants receiving rental concessions in order for the Debtor to keep them in place will only increase.  And the new leases the Debtor has signed are at rental rates far below those at which it would have to lease in order to meet its revenue projections.  For these reasons and the reasons set forth above explaining why the Plan is not feasible, the Plan should not be confirmed

  H. <u>The Plan Cannot Be Confirmed Because It Violates 11 U.S.C. § 1129(a)(8) and Does Not Satisfy 11 U.S.C. § 1129(b)(2).</u>

  A plan that cannot satisfy 11 U.S.C. § 1129(a)(8), requiring that each class be unimpaired or accept the plan, may not be confirmed unless it is "fair and equitable" to secured and unsecured creditors.  11 U.S.C. § 1129(b)(2).  In essence, this requires a plan to pay secured creditors the present value of their claims or retain liens securing the allowed amounts of their claims.  It also requires that the debtor satisfy the absolute priority rule by paying unsecured creditors the present value of their claims or by forcing former equity holders to contribute new value to the Debtor in order to receive equity interests in the reorganized debtor.

  1. The Plan is Not "Fair and Equitable" to Secured Creditors.

  To be fair and equitable with respect to secured creditors, the Plan must comply with 11 U.S.C. § 1129(b)(2)(A)(i)–(iii) by allowing Belmont to (i) retain its liens on its collateral in an amount equal to the allowed amount of its claim; and (ii) receive cash payments which have a value equal to Belmont's interest in the estate's interest in the Property as of the effective date of the plan (*i.e.*, present value).  11 U.S.C. § 1129(b)(2)(A)(i).  Present value includes the time value of money (*i.e.*, a stream of payments to be received in the future has less value than if that money were paid today); therefore, the Court must set an appropriate "discount rate" to be paid on the unpaid portion of the secured claim, so that the creditor receives the present value of its claim.  *See In re Weinstein*, 227 B.R. 284, 294 n. 11 (9th Cir. B.A.P. 1998).  The "present value" prong requires an interest rate sufficient to account for the time value of money *and* to protect the creditor from the risk of deferred payments.  *See Till v. SCS Credit Corp.*, 541 U.S. 465, 478-479

-24-

(2004) (requiring a risk adjustment in the interest rate applied to deferred cash payments in a cramdown plan); *In re Fowler*, 903 F.2d 694, 697-98 (9th Cir. 1990) (explaining that the appropriate interest rate is calculated by starting "with a base rate . . . and add[ing] a factor based on the risk of default and the nature of the security"); *In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503, 1504 (9th Cir. 1987) (reasoning that the appropriate interest rate is that which "the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security"); *In re Marquez*, 270 B.R. 761, 769-72 (Bankr. D. Ariz. 2001) (recognizing that a lender's risk in commercial loans is higher than in consumer loans). In this case, the 6% interest rate the Plan proposes to pay Belmont does not account for the significant risks the Debtor has imposed on Belmont, for the reasons stated below.[12]

Additionally, courts have refused to approve plans such as the Debtor's that extend the term of the secured loan significantly beyond the original term of the loan, because such extensions create unfair risk to secured creditors. *See Fed. Savs. & Loan Ins. Corp. v. D & F Constr., Inc. (In re D & F Constr. Inc.),* 865 F.2d 673 (5th Cir. 1989); *see also 7 Collier on Bankruptcy* ¶ 1129.04[2][a] n.18 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). "[A] plan proposal to extend a matured, short-term loan over a substantially longer term is subject to particularly close scrutiny." *In re Orchards Vill. Invs., LLC*, No. 09-30893-fldll, 2010 WL 143706 at *20 (Bankr. D. Or. 2010) ("Although not per se objectionable, careful scrutiny must be given to a debtor's plan which proposes to convert a fully matured short term loan into permanent financing.") (*quoting Imperial Bank v. Tri-Growth Centre City, Ltd. (In re Tri-Growth Centre City, Ltd.)*, 136 B.R. 848, 852 (Bankr. S.D. Cal. 1992)); *In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937, 941 (Bankr. S.D. Fla. 1992) ("Debtor has not provided the Court with any authority that a

---

[12] Belmont will supplement this discussion after the expert witness it intends to retain issues a report on the subject, and expressly reserves its rights to do so.

Quarles & Brady LLP

loan in its ninth year of a ten year term can be stretched out for another ten years, where the current market for similar loans (as admitted by the debtor's expert) is only three to four years."); *In re D & F Constr., Inc.,* 865 F.2d 673 (5th Cir. 1989)).

In this case, as a result of the riskiness of the Debtor's operations and the terms of the Plan, the 6% interest rate proposed by the Debtor is woefully insufficient under *Till* and its progeny to protect Belmont from the risks associated with the Debtor's Property[13] - not least among them the fact that the Property cannot support its own operating expenses plus a debt service payment. In fact, Exhibit "A" to the Debtor's Disclosure Statement reveals that the Property's operations will result in a negative cash flow for years 1 through 3 and year 7 of the Plan (four of the seven years covered by the projections). While the Debtor intends to offset these staggering losses (projected to exceed $4.8 million in the first three years alone) with new equity, the equity is not sufficient to pay down Belmont's $47.2 million secured claim in any meaningful way as previously discussed. Belmont's original expectation of repayment of its $76 million loan in three years has now been reduced to a possibility of repayment of $7 million within an additional seven years, with a required but illusory $40 million balloon payment due at the end of the seven-year term (as a result of the Debtor having crammed Belmont down and stretched its three-year loan into a ten-year loan). While the Bankruptcy Code allows the Debtor to cramdown Belmont, the Debtor can only do so if its Plan meets certain conditions - including compensating Belmont for the drastically increased risk the new repayment schedule forces it to bear. The Plan does not satisfy such conditions, and therefore cannot be confirmed.

The risks attending Belmont's payment under the Debtor's Plan are extreme. For the Debtor to make the $40 million balloon payment seven years into the future, the Property will have to undergo a dramatic and immediate increase in value, and/or the Debtor's investors will

---

[13] Belmont plans to present an interest rate expert and a feasibility expert at any trial that may be conducted on confirmation, and therefore expressly reserves the right to supplement this Objection, particularly with regard to this discussion of risk and feasibility (which are, for the most part, inextricably intertwined).

QB\138887.00002\13339449.5

have to either sell or refinance the Property to make the payment to Belmont. Given the attitude of the current management (which will remain in place under the Plan), it is unrealistic to believe the balloon payment will be made if the Debtor's equity has not realized some significant profit for itself (at Belmont's expense). Moreover, it is doubtful the Property value will have drastically increased in seven years, particularly when industry experts are currently predicting that Scottsdale rents will likely not increase for at least the next three years. The Debtor has not outlined any means of how it will seek and receive financing for a loan with a 100% loan to value ratio. Given that the Debtor failed prior to the petition date to obtain financing sufficient to refinance iStar's claim, its ability to secure refinancing for the Property is entirely speculative, and under the Plan, the risk of the Debtor's failure is borne entirely by Belmont, not the Debtor.

Moreover, the Plan increases Belmont's risk associated with the Property by eliminating essential provisions of Belmont's bargained-for loan documents. Articles 2, 3, and 4.3 of Belmont's promissory note will not be effective going forward under the Plan. Portions of Articles 2 and 4.3, which are attached hereto as Exhibit "B," contain such risk-minimizing provisions as the order in which Belmont may apply monthly payments to principal and interest (2.2.C), and Belmont's late charge and default interest provisions (4.3). The elimination of these provisions increases Belmont's risk even further, particularly when Belmont will be deprived of its basic right to late charges and default interest if the Debtor defaults on payments, for the next seven years. The Debtor could simply defer monthly payments to Belmont at a whim, without consequence. Moreover, the Debtor has eliminated Belmont's right to approve the brokers, agents, and others who the Debtor may engage to market, lease, and/or sell the assets of the reorganized debtor, which constitute Belmont's collateral. The Debtor has therefore eliminated yet another protection Belmont had to preserve and maximize the value of its own collateral. The Plan, therefore, does not pay Belmont in full for the present value of its claim and thus is *per se* invalid and unconfirmable.

-27-

Finally, the Plan impermissibly violates Belmont's rights under 11 U.S.C. § 1129(b)(2)(A)(ii) by proposing an auction of the Debtor's equity interests (in other words, its enterprise value), without allowing Belmont the opportunity to credit bid as required by §§ 1129(b)(2)(A)(ii) and 363(k). Belmont's collateral includes all of the Debtor's property, including general intangibles, which, in turn, includes the enterprise value of the Debtor or the reorganized debtor. That value is exactly what the Debtor proposes to provide to RCCH or any other successful bidder at the auction - the enterprise value in the reorganized debtor. Therefore, to comply with 11 U.S.C. § 1129(b)(2)(A), the Debtor must allow Belmont to credit bid for its collateral. Because the Debtor has not done so, the Plan does not comply with 11 U.S.C. § 1129(b)(2)(A) and cannot be confirmed.

2. The Plan Cannot Be Confirmed Because It Violates the Absolute Priority Rule (Is Not Fair And Equitable To Unsecured Creditors).

A plan is "fair and equitable" to unsecured creditors when: (i) deferred cash payments to unsecured creditors equal the present value of their allowed claims, or (ii) the holders of junior claims or interests do not receive any payment on account of their claims or interests (the absolute priority rule). 11 U.S.C. § 1129(b)(2)(B)(i)-(ii). The Plan proposes to pay its general unsecured creditors an undisclosed fraction of their allowed unsecured claims seven years from the effective date (with a nominal $500,000 pro rata distribution 90 days after the effective date), through pro rata distributions, in the last year of the Plan, of a $3 million subordinated debenture that will not accrue interest. [Plan at 16-18.] Because creditors in Class 5 will not receive an amount equal to their claim, the Plan does not meet the standard of 11 U.S.C. § 1129(b)(2)(B)(i).

The Plan also fails the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii). Despite the fact that the Debtor propose to only pay the general unsecured creditors an undisclosed fraction of their claims in seven years, the Plan proposes to allow the current owners to retain their entire ownership interests in the Debtor. This treatment, which allows holders of interests junior to Class 5 to retain 100% of their property, is a blatant violation of 11 U.S.C. § 1129(b)(2)(B)(ii). *In*

-28-

*re Ambanc Mesa Ltd. P'ship*, 115 F.3d 650 (9th Cir. 1997). Similar to the secured creditor in *Ambanc*, the package of rights afforded to Belmont under the Plan does not provide Belmont with any upside potential. Because the Plan only pays holders of Class 5 General Unsecured claims an undisclosed fraction of the amount of their claims, while allowing junior equity security holders to retain 100% of their property, the Plan fails to satisfy the minimal standard of fair and equitable treatment under 11 U.S.C. § 1129(b)(2)(B), and is thus not confirmable under 11 U.S.C. § 1129(b)(1).

The "new value exception" is an exception to the absolute priority rule recognized by some courts that requires a certain type of capital infusion by the junior class in order to avoid the requirements of 11 U.S.C. § 1129(b)(2)(B)(ii). More specifically, bankruptcy courts require that, in order for old equity holders to retain their interests in the Debtor, the capital contribution must be (a) new, (b) made in money or money's worth, (c) necessary for a successful reorganization, (d) substantial and reasonably equivalent to the value or interest being received, and (e) open to valuation by the market. *In re Suncruz Casinos, LLC*, 298 B.R. 833, 841 n.4 (Bankr. S.D. Fla. 2003). Additionally, "plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)." *203 North LaSalle,* 526 U.S. at 458. In other words, the Supreme Court has made clear that the debtor's pre-petition interest holders cannot have the exclusive right to bid on the equity in the reorganized debtor.

In this case, the Debtor's old equity holders do not meet the requirements of the new value exception. Specifically, although the $5,500,000 contribution is "new," it is not reasonably equivalent to the interest being received, which is any upside potential of the reorganized debtor, which the Debtor's own projections estimate to be approximately $30 million. While this projection is questionable, obviously the Debtor and its equity holders believe that they will reap this windfall. Furthermore, it is beyond dispute that the Debtor's investors will have the benefit

of the Debtor's discharge of some $30 million of Belmont's debt.[14]  That proposed new value is grossly insufficient to excuse compliance with the absolute priority rule.

Moreover, the Debtor's arbitrary valuation of the necessary new value contribution does not comply with the Supreme Court's mandates in *203 North LaSalle,* 526 U.S. 434.  Pursuant to *LaSalle*, the amount to be contributed by new equity must be exposed to market competition.  A "provision for vesting equity in the reorganized business in the Debtor's partners without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan" renders any Chapter 11 plan unconfirmable.  *LaSalle* at 454.  The reason for this is simple, and goes back to the Bankruptcy Code's goals of maximizing the value of the estate:

> If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness (unless to trump an equal offer from someone else); if it is not the best, there is no apparent reason for giving old equity a bargain.  There is no reason, that is, unless the very purpose of the whole transaction is, at least in part, to do old equity a favor.

*Id.* at 456.  Therefore, "the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interest extended 'on account of' the old equity position" and in violation of the Bankruptcy Code.  *Id.*

In this case, the Debtor still retains the exclusive right to file a plan, so the only procedure by which an appropriate new value contribution may be determined under *LaSalle* is through a competitive public auction.  But as discussed above, each and every provision of the Debtor's proposed auction procedures shields equity from a competitive bidding process.  In addition, the Plan appears to preclude Belmont from exercising its own credit bidding rights at the auction in

---

[14] It is interesting that the Debtor projects a return on equity's investment in the approximate amount of Belmont's discharged debt.

QB\138887.00002\13339449.5

Quarles & Brady LLP

Quarles & Brady LLP

violation of 11 U.S.C. §§ 363(k) and 1129(b)(2)(A)(ii), creating even more unwarranted exclusivity for old equity in the bidding.

Moreover, the Debtor has not even attempted to find a way to allow third-parties to participate in any equity auction. Assuming the Debtor is correct (which Belmont does not concede), and that securities laws would apply to the issuance of its new equity, the Debtor has made no attempt to support its position that it would be a violation of the securities laws to allow a person other than a creditor or existing equity holder to bid at the auction. For example, while the Debtor states that RCCH (the current equity) will be the stalking horse bidder, the Debtor does not state whether the ownership of RCCH will not change. If RCCH brings in new equity holders, then the Debtor must explain why RCCH would be exempt from the securities laws but the Debtor would not.

The Debtor appears to be relying solely upon 11 U.S.C. § 1145 as the only exemption or safe harbor that would allow third-parties to participate in the auction. For example, the Debtor does not explain whether and under what circumstances a membership interest in a limited liability company would be a "security." Even assuming that the Debtor is correct, the Debtor does not even attempt to find any applicable exceptions. For example, the Debtor has not even tried to explain why various sections of the Securities Act of 1933 would not exempt the issuance

QB\138887.00002\13339449.5

of the new membership interests from any necessary compliance with securities laws. *See* Securities Act of 1933, Section 3(a), codified as amended at 15 U.S.C. § 77c(a).[15]

The auction procedures set forth in the Plan are far too protectionist to pass muster under *203 N. LaSalle*. Plans such as this one, "providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)." 526 U.S. at 458. The Plan violates the absolute priority rule; it is not "fair and equitable" and it must not be confirmed.

## III. <u>CONCLUSION.</u>

For all of the foregoing reasons, Belmont respectfully requests that the Court enter an Order:

      A.      Denying confirmation of the Plan;

      B.      Granting stay relief to Belmont, and

---

[15] For example, the Debtor has not explained why one of the following exemptions would not apply in this case:

a.     Exempted securities

Except as hereinafter expressly provided, the provisions of this title shall not apply to any of the following classes of securities:

. . .

(7) Certificates issued by a receiver or by a trustee or debtor in possession in a case under title 11 of the United States Code, with the approval of the court;

. . .

(10) Except with respect to a security exchanged in a case under title 11 of the United States Code, any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval;

. . .

(11) Any security which is part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within or, if a corporation, incorporated by and doing business within, such State or Territory.

15 U.S.C. § 77c(a)(7), (10), (11).

-32-

Quarles & Brady LLP

1        C.  Granting such other relief as is just and lawful under the facts and

2    circumstances of this case.

3       RESPECTFULLY SUBMITTED this 18th day of May, 2011.

4

5                QUARLES & BRADY LLP
                 One South Church Avenue, Suite1700

6                Tucson, Arizona  85701

7

8                By  */s/ Susan G. Boswell*
                   Susan G. Boswell

9

10               Attorneys for SFI Belmont LLC, successor-in-
                 interest to iStar FM Loans LLC

11

12   COPIES of the foregoing sent via
     electronic or First Class U.S. mail
13   this 18th day of May, 2011, to:

14   John J. Hebert
     Philip R. Rudd
15   Polsinelli Shughart, P.C.
     3636 N. Central Avenue, Suite 1200
16   Phoenix, AZ 85012
     jhebert@polsinelli.com
17   prudd@polsinelli.com
     *Attorneys for Debtor*
18

19   Lori A. Lewis
     Maricopa County Office Of
20   General Litigation Services
     301 W. Jefferson, Suite 3200
21   Phoenix, AZ 85003
     lewisl004@mail.maricopa.gov
22   *Attorney for Maricopa County Treasurer*

23

24

25

26

Renee Sandler Shamblin
Office Of The U.S. Trustee
230 North First Avenue, Suite 204
Phoenix, AZ 85003
renee.s.shamblin@usdoj.gov

*/s/ Kelly Webster*

-34-